Johnson, J.,
 

 delivered the opinion of the court, as follows : — This capture was made on the high seas, about a month after the declaration of war. The claimant, Harrison, had purchased a quantity of English goods, in England, “ a long time,” to use his own language, before the declaration of war, and deposited them on a small island, called Indian island, near to the line between Nova Scotia and these states. Uupon the breaking out of the war, his agents in Boston hired the Rapid, a licensed vessel in the cod-fishery, to proceed to the place of deposit and bring away these goods. On her return, she was captured by the Jefferson privateer, and was condemned for trading with the' enemy’s country.
 

 *On the argument, it was contended, in behalf of the appellant, that this was not a trading, within the meaning of the cases cited, to L support the condemnation; that, on the breaking out of a war, every citizen had a right, and it was the interest of the community to permit her citizens, to withdraw property lying in an enemy’s country and purchased before the war ; finally, that neither the declaration of war, nor the commission of the privateer authorized the capture of this vessel and cargo, as they were, in fact, American property.
 

 It is understood, that the claim of the United States for the forfeiture, is not now interposed. The court, therefore, enters upon this consideration
 
 *103
 
 unemba rrassed by a claim which would otherwise ride over every question now before us.
 

 This is the first case, since its organization, in which this court has been called upon to assert the rights of war against the property of a citizen. It is, with extreme hesitation, and under a deep sense of the delicac3r of the duty which we are called upon to discharge, that we proceed to adjudge the forfeiture of private right, upon principles of public law, highly penal in their nature, and unfortunately, too little understood.
 

 But a new state of things has occurred — a new character has been assumed by this nation, which involves it in new relations, and confers on it new rights ; which imposes a new class of obligations on our citizens, and subjects them to new penalties. The nature and consequences of a state of war must direct us to the conclusions which we are to form on this case.
 

 On this point, there is really no difference of opinion among jurists : there can be none among those who will distinguish between what it is, in itself, and what it ought to be, under the influence of a benign morality and the modern practice of civilized nations. In the state of war, nation is known to nation only by their armed exterior; each threatening the other with conquest or annihilation. The individuals who compose *the belligerent *161] states, exist, as to each other, in a state of utter occlusion. If they meet, it is only in combat. War strips man of his social nature ; it demands of him the suppression of those sympathies which claim man for a brother; and accustoms the ear of humanity to hear with indifference, perhaps exultation, “ that thousands have been slain.” These are not the gloomy reveries of the bookman. From, the earliest time of which historians have written or poets imagined, the victor conquered but to slay, and slew but to triumph over the body of the vanquished. Even when philosophy had done all that philosophy could do, to soften the nature of man, war continued the gladiatorian combat : the vanquished bled, wherever caprice pronounced her
 
 flat.
 
 To the benign influence of the Christian religion it remained to shed a few faint rays upon the gloom of war ; a feeble light but barely sufficient to disclose its horrors. Hence, many rules have been introduced into modern warfare, at which humanity must rejoice, but which owe their existence altogether to mutual concession, and constitute so many voluntary relinquishments of the rights of war. To understand what it is in itself, and what it is under the influence of modern practice, we have but too many opportunities of comparing the habits of savage, with those of civilized warfare.
 

 On the subject which particularly affects this case, there has been no general relaxation. The universal sense of nations has acknowledged the demoralizing effects that would result from the admission of individual intercourse. The whole nation are embarked in one common bottom, and must be reconciled to submit to one common fate. Every individual of the one nation must acknowledge every individual of the other nation as his own enemy — because the enemy of his country. It is not necessary to quote the authorities on this subject; they are numerous, explicit, respectable, and have been ably commented upon in the argument.
 

 But after deciding what is the duty of the citizen, the question occurs, “162] what is the consequence of a breach of that duty ? *The law of prize is part of the law of nations. In it, a hostile character is attached to trade, independently of the character of the trader who pursues or directs
 
 *104
 
 it. Condemnation to the use of the captor is equally the fate of the property of the belligerent, and of the property found engaged in anti-neutral trade. But a citizen or ally may be engaged in a hostile trade, and thereby involve his property in the fate of those in whose cause he embarks.
 

 This liability of the property of a citizen to condemnation as prize of war, may be likewise accounted for under other considerations. Everything that issues from a hostile country is,
 
 primé facie,
 
 the property of the enemy
 
 ;
 
 and it is incumbent upon the claimant to support the negative of the proposition. But if the claimant be a citizen or an ally, at the same time that he makes out his interest, he confesses the commission of an offence which, under a well-known rule of the civil law, deprives him of his right to prosecute his claim.
 

 This doctrine, however, does not rest upon abstract reason. It is supported by the practice of the most enlightened (perhaps we may say of all) commercial nations. And it affords us full confidence in our decision, that we find, upon recurring to the records of the court of appeals in prize eases, established during the revolutionary war, that in various cases, it was reasoned upon as the acknowledged law of that court. Certain it is, that it was the law of England, before the revolution, and therefore, constitutes a part of the admiralty and maritime jurisdiction confei’red on this court in pursuance of the constitution.
 

 After taking this general view of the principal doctrine on this subject, we will consider the points made in behalf of the claimant in this case, and—
 

 1. Whether this was a trading, in the eye of the prize law, such as will subject the property to capture ? The force of the argument on this point, depends upon the terms made use of. If, by trading, in prize law, was meant that signification of the term which consists in negotiation or contract, this case would certainly not come under the penalties of the rule. But the object, policy and spirit of the rule is to cut off all communication or actual ^locomotive intercourse between individuals of the belligerent states. Negotiation or contract has, therefore, no necessary connection L with the offence. Intercourse, inconsistent with actual hostility, is the offence against which the operation of the rule is directed : and by substituting this definition for that of trading with an enemy, an answer is given to this argument.
 

 2. Whether, on the breaking out of a war, the citizen has a right to remove to his own country with his property, is a question which we conceive does not arise in this case. This claimant certainly had not a right to leave the United States, for the purpose of bringing home his property from an enemy country ; much less could he claim it as a right, to bring into this country goods, the importation of which was expressly prohibited. As to the claim for the vessel, it is founded on no pretext whatever; for the undertaking, besides being in violation of two laws of the United States, was altogether voluntary and inexcusable. With regard to the importations from Great Britain about this time, it is well known, that the forfeiture was released on grounds of policy and a supposed obligation induced by the assurances which had been held out by the American
 
 charge d’affaires
 
 in England. But this claimant could allege no such excuse.
 

 3. On the third point, we are of opinion, that the foregoing observations
 
 *105
 
 furnish a sufficient ansAver. If the right to capture property thus offending, grows out of the state of war, it is enough to support the condemnation in this case, that the act of congress should produce a state of war, and that the commission of the privateer thould authorize the capture of any property that shall assume the belligerent character. Such a character we are of opinion this vessel and cargo took upon herself ; or, at least, she is deprived of the right to prove herself othenvise.
 

 Rush,
 
 Attorney-General.
 

 The United States claim the property in question, as a forfeiture under the non-intercourse act of 1st March 1809. This act was in force at the breaking out of the war, and still continued in force, at the time of the capture of the Rajfid. The 6th section of the act declares the prohibited goods liable to forfeiture, immediately on being shipped, with intention of importing the same into the United States. The United States do not claim in any case, but Avhere the vessel was unquestionably bound and sailing to the United States, and when no force was necessary to bring her in. When such a vessel actually arrives in a port of the United States, the intent is not only evidenced, but carried into effect, and the offence is complete.
 

 The arrival, in this case, must be taken as a voluntary coming into port. For as the Rapid was bound to the United States, previous to the capture, the intervention of the privateer was immaterial, and cannot be considered as rendering the arrival involuntary. The commencement of the illegal act was at the time of the shipment, and was prior to any forfeiture under belligerent rights. The forfeiture under the non-intercourse act, therefore, relates back to the inception of the offence. The municipal law, we contend, abrogated
 
 the jus belli, pro tanto.
 

 It is true, that, by the 14th section of the prize act of 26th June 1812 (2 U. S. Stat. 763) provision is made for the importation of British goods captured from the enemy, and made good and lawful prize of war ; and it is admitted, that such goods are forfeited and accrue to the captors ; but the *1661 fiuesti°n recurs, what is *good and lawful prize of war ? Not, we J contend, American property, in an American bottom, coming to the United States, as in the present case. By the 16th section of the same act, the act of 4th of April 1812, laying an embargo, and the non-exportation act of the 14th of the same month, are repealed, so far as they relate to ships and vessels having commissions or letters of marque and reprisal. It was equally necessary, that there should be an express repeal of the non-intercourse act. By the act of 2d January 1813 (2 U. S. Stat. 789), directing the secretary of the treasury to remit fines, forfeitures and penalties in cer
 
 *106
 
 tain cases, property shipped and departing from Great Britain between the 23d of June and 15th of September, and forfeited, under the non-intercourse acts, to the United States, is to be restored to the owners : no notice is taken of any claim of the captors. The plain inference is, that the legislature did not suppose that any claim existed on the part of the captors. The same inference may be drawn from the act of 27th February 1813. (Ibid. 804.)
 

 
 *105
 
 We are aAvare, that there may exist considerable hardship in this case ; the owners, both of vessel and cargo, may have been unconscious that they were violating the duties which a state of war imposed upon them. It does *, „ . not appear, that they meant a daring violation either *of the laws or belligerent rights of their country. But it is the unenvied province of this court, to be directed by the head, and not the heart. In deciding upon principles that must define the rights and duties of the citizen and direct the future decisions of justice, no latitude is left for the exercise of feeling.
 

 Friday, March 11th, 1814. The claim of the United States was taken up.
 

 
 *106
 
 The sovereign is not to be deprived of his rights by implication. Where the rights of the sovereign clash with those of a private individual, the rights of the latter must yield to those of the former.
 
 Fisher
 
 v.
 
 Blight,
 
 2 Cr. 358 ;
 
 Hales
 
 v.
 
 Petit,
 
 Plowd. 258. This last is a leading case on this point.
 

 From the act of 13th July 1813 (3 U. S. Stat. 4), it is clearly to be inferred, that, previous to the passage of that act, the rights of the captors were considered as being merged in the forfeiture under the non-intercourse acts. The act of July has merely suspended the right of the United States.
 

 Pitman,
 
 contra, for the captors.
 

 We do not claim adversely to the United States, but under the United States, as grantees. We were authorized by our commission to capture this vessel, and upon capture, it was forfeited to us : condemnation, we *contend, is not necessary to give us r*166 title : our title accrued at the moment of capture. The United States *- relinquished to us their right, by § 4 of the prize act. The non-intercourse act had reference solely to time of peace.
 

 The property in question could not be forfeited to the United States, merely by being put on board; for a municipal law can only have a municipal operation ; it cannot operate exlra-territorially ; it can have no effect upon goods in a foreign country, whether that country be hostile or neutral. Again, by the act of 1st March 1809, § 8, no persons are authorized to seize property for a violation of that act, except the officers particularly mentioned therein. Until, therefore, a seizure was made by some person so authorized, no forfeiture to the United States could attach : and if, as in the present case, a seizure had been made
 
 jure belli,
 
 no seizure under the municipal act could subsequently be made, until the first was determined.
 
 The Mercurius,
 
 1 Rob. 68, 81.
 

 The non-intercourse act was merged in the declaration of war, as it respected British subjects and American citizens : this property was, therefore, forfeited to the United States
 
 jure belli:
 
 they had a right to seize it
 
 jure belli:
 
 this right they have granted to us, and our title to the property we have captured must be tried
 
 jure belli.
 
 If this were a municipal seizure, and if the property were British, the British owner would have had a right to come into court and assert his claim ; but this he could not now do, being an alien enemy.
 

 The 2d section of' the act of the 13th July 1813, we consider, notwithstanding what has been said by the counsel for the United States, as acknowledging a previous right in the captors.
 

 Jones,
 

 on the same side considered, 1st. The law independent of the instructions of the president to privateers. *2d. The instructions p. themselves. L
 

 1st. The United States did not mean to relinquish the broad ground of
 
 *107
 

 jus belli,
 
 as to British property coming to the United States. The declaration of war and the prize act, being subsequent to the non-intercourse law, are to be considered as having abrogated or superseded that law.
 

 But if this should not be admitted, we contend, that these acts may exist together, without any inconsistency. There is room enough both for the non-intercourse and the prize act. It has been decided by this court, that trading with the enemy is,
 
 per se,
 
 a ground of confiscation ; there, then, the prize act may operate. But many hostile cargoes may escape capture, and reach the United States ; many such cargoes may be imported by neutrals ; here is room for the operation of the non-intercourse act. The act of 13th July 1813, relinquishing to the captors the olaims of the United States to the captured property, is conclusive to show that the United States did not mean to relinquish the rights of war. That act describes the property to which the United States give up their claim, as property captured on the high seas, without limitation.
 

 2d. As to the president’s instructions. These instructions do not apply to vessels sailing after knowledge of the declaration of war. But we contend, that the president, not having the power of war and peace, had no authority to give such instructions : he could only control the privateers, by the power he had of revoking their commissions. There is a difference between his power over these vessels and his power over the public armed ships of the United States. The prizes taken by privateers under the prize act, are forfeitures, and are to be appropriated differently from those captured under the non-intercourse act. To show that the capture, and not the , condemnation, :|:is the foundation of the captor’s right of property, J the court is refei’red to
 
 Morrough
 
 v.
 
 Comyns,
 
 1 Wils. 211.
 

 Irving,
 
 contrá.
 

 By the 3d section of the prize act, privateers are bound to observe all the laws of the United States. Supposing, thererefore, the non-intercourse act to have been in force, they had no right to seize for a violation of that act. Besides, the mode of prosecution under the non-intercourse act is essentially different from that directed to be pursued under the prize act. There is also a difference in the manner of distributing the captured property.
 

 Pinkney.
 

 The rights of the captors depend not upon the non-intercourse act. Both that and the prize act may be in force, at the same time, and operate on the same thing. The first seizure decides which mode of condemnation, &c., shall be adopted.
 

 Harper,
 
 in reply.
 

 There is a distinction between importations made by citizens of the United States, and those made by foreigners. The latter cannot be affected by the non-intercourse act, until the goods have arrived within the United States. They commit no offence, until the goods are actually imported. But with regard to citizens of the United States, the case is different.
 
 They
 
 are guilty of a violation of the act, by the mere shipment of prohibited goods in a foreign country, with intent to import the same into the United States. The law, as to them, has an extra-territorial operation ; it binds them wherever they are. By the shipment, therefore, at Indian island, with intent to import into the United States, the property in the
 
 *108
 
 present case, was immediately forfeited ; and the right of the United States to the forfeiture, at that moment became complete.
 

 For the opinion of The Court on the foregoing question, respecting the claim of the United States, under the non-intercourse act, see the opinion in the case of
 
 The Sally,
 
 delivered by Story, J., 15th March 1814
 
 (post,
 
 p. 382), in which the court decided in favor of the captors.