## CHARLES S. MIXER *et al.*

*v.*

## ORIGEN SIBLEY *et al.*

1. ALIEN ENEMY—*whether he may be sued pending hostilities—effect of the prohibition of commercial intercourse during the late rebellion.* The act of congress of July 12, 1861, empowering the President to prohibit, by proclamation, all commercial intercourse between the rebellious and the loyal States, and the proclamation of the President in pursuance thereof, issued August 16, 1861, prohibiting such intercourse, were not designed to deprive creditors in the adhering States from the use of all such remedies for the collection of their debts, as the laws of those States gave them.

2. Such intercourse as is inconsistent with actual hostilities, was forbidden, and that is, not negotiation or contract, but actual locomotive intercourse between individuals of the belligerent States. The law, and the proclamation, were aimed at commercial transactions and commercial objects only, and not to arrest the proceedings of courts of justice.

3. So where a party residing in this State, holding a promissory note against a person residing in one of the States in rebellion, in the year 1862, after the act of congress and the President's proclamation prohibiting commercial intercourse between the adhering States and those in rebellion, commenced a suit thereon by attachment, which was levied on real estate situate in this State, belonging to the maker, and obtained a judgment, and procured a sale to be made of the premises attached, it was *held*, there being no objection interposed, the court had jurisdiction of the cause, and the judgment and proceedings thereunder were valid and binding, notwithstanding the defendant resided in one of the rebellious States, and the war was at the time in active progress.

4. SAME—*of proceedings to condemn land of an alien enemy, for railroad purposes.* And where proceedings were instituted, under the same circumstances, to condemn the land of a party residing in one of the rebellious States, for railroad purposes, it was *held*, the proceedings being regular, could not be questioned.

5. EXECUTION SALES OF LAND—*en masse—whether they will be set aside.* As between the purchaser of real estate at an execution sale, and the original parties to the suit, a court will not hesitate to set aside the sale, if the lands were sold *en masse*, where there appears to be fraud in the transaction; but as against innocent second purchasers, it has never been done.

6. SAME—*inadequacy of price—not alone sufficient.* Where it was sought to set aside a sale of land, on the ground that it was sold *en masse*, and that

it sold at only one-fourth its estimated value, it was *held,* that mere inadequacy of price is not sufficient, of itself, to set aside a sale in any case where the right of redemption is given, unless there are some indications of fraudulent practices, or some advantage taken against the debtor not warranted by law.

7.  REDEMPTION *from sale under execution at law—in equity—lapse of time as to a party residing in one of the rebellious States.*  A judgment in an attachment suit was rendered against a party residing in the State of Alabama, in the year 1862, the war of the rebellion then being in active progress. The attachment was levied upon an undivided interest of the defendant in a tract of land in this State, and a sale was had on the thirteenth of December, 1862, the plaintiff in the suit being the purchaser.  The time of redemption expired on the thirteenth of December, 1863.  The debtor died in the State of Alabama in October, 1864, without having redeemed from the sale. Hostilities did not cease until the thirteenth of June, 1865.  In the mean time the purchaser at the sale had obtained a deed, and sold a portion of his interest, and, upon partition, the residue was allotted to him in severalty. In April, 1866, less than one year after hostilities ceased, the heirs of the debtor, some of whom were minors, filed their bill to redeem from the sale, so far as concerned that portion of the land still held by the first purchaser: *Held,* that in analogy to the rule that the statute of limitations was suspended in its operation during the war, as to parties similarly situated, the time for the redemption should likewise be suspended, and the heirs were still entitled to redeem.

8.  SAME—*of the terms upon which redemption was allowed.*  In fixing the terms upon which the heirs should be allowed to redeem, it was considered, inasmuch as there was no evidence of bad faith on the part of the creditor in obtaining his judgment, or in his purchase at the sheriff's sale, he would not be required to account for any surplus, over and above the amount of his judgment, received by him from a sale of a portion of his interest.  If, however, the amount received by him did not equal the amount of his judgment, the heirs seeking redemption should pay the balance of the judgment; upon paying which, or if the receipts by the creditor on the sale he had made should equal or exceed the amount of his judgment, he should release to the heirs his title to the portion of the land still held by him, he being required to remove at his own cost, any incumbrance he may have placed on the premises, and to be allowed for all taxes and assessments paid by him thereon, and other necessary expenses attending the same.

9.  JURISDICTION IN CHANCERY—*in such case.*  Although the right of redemption in such case is a strictly legal right, yet as that right still existed, but the sheriff's deed standing in the way of the redemption, a court of equity would interpose to remove the obstruction, and having thus properly obtained jurisdiction, would retain the cause in order to dispose of the whole subject.

APPEAL from the Superior Court of Chicago.

The opinion of the court contains a full statement of the case.

The principal question arises in respect to a claim on the part of the appellees, of the right to redeem from a sale of realty under an execution at law, after the statutory time for redemption had expired. This claim is founded upon the peculiar circumstances of the case, which are, substantially, as follows: In the year 1862, Mixer sued out a writ of attachment in this State, in a suit upon a promissory note, against Origen Sibley, who was a resident of the State of Alabama. There was constructive notice only, to Sibley, by publication. The attachment was levied upon an undivided interest of Sibley in a tract of land situate in this State. A judgment was obtained, and a sale of the property attached was had on the thirteenth of December, 1862. Sibley died in the State of Alabama in October, 1864, without having redeemed from the sale, the time for redemption having expired on the thirteenth of December, 1863. The war of the rebellion was in active progress from the time of commencing the suit until the thirteenth of June, 1865, Sibley, during all that time, until his death, remaining in the State of Alabama, which was actively engaged in the war, on the side of the rebellion. In April, 1866, less than one year after hostilities ceased, the heirs of Sibley, some of whom were minors, filed their bill in chancery to redeem from the sale, placing their claim so to do upon the ground, among others, that under the act of congress and the President's proclamation, forbidding commercial intercourse between the people of the adhering and those of the rebellious States, Mixer had no right to institute the suit against the ancestor of complainants, and the judgment and proceedings thereunder were void. Furthermore, the right of redemption is claimed upon the ground that by reason of the state of war, neither Sibley nor his heirs had the power to come into this

State for the purpose of redeeming, within the statutory period, and complainants insist they still have the right to redeem, so far as concerns such portion of the premises still held by Mixer. The court below decreed as prayed in the bill. The defendants thereupon appealed.

Messrs. WALKER & DEXTER, for the appellants.

The principal question to be determined is, as to the effect of the civil war existing at the time said attachment proceedings were commenced, the act of congress, and the proclamation above referred to, upon such proceedings, the defendant, at the time of their commencement, being a citizen of one of the rebel States. This is the only serious question involved in this litigation. There are several other points, it is true, raised by the appellees, but we do not believe it will be seriously claimed by them, that any of them are of a character or of sufficient importance to enable them to sustain the decree of the court below, if this question should be determined in our favor.

In the discussion of this question, we do not propose to deny the well settled rule of law, that the existence of war suspends all commercial intercourse between the two contending parties; and are willing to concede that one of the immediate consequences of the commencement of hostilities, is the interdiction of all commercial intercourse between the subjects of the nations at war, without the license of their respective governments.

The term "commercial intercourse," however, within the meaning of this rule, must be construed with reference to the reason, object and purpose of the rule itself.

This rule has its foundation in public policy, and is established for the purpose of preventing the giving of aid and comfort to an enemy in time of war; its object being to enable the government and its subjects to retain in their possession all the means and money they may have at the

commencement of hostilities, whether of their own or belonging to the enemy, which may aid the government in the prosecution of the war, and to prevent, as far as may be, their transfer to the enemy's country, as well as the sending of traitorous communications.   And the term "commercial intercourse," as here used, we insist must be limited to all such actual locomotive intercourse between the individuals of the belligerent States, as is inconsistent with actual hostility, and should not be held to include those transactions and dealings which do not conflict with the object, policy and spirit of the rule.   Mr. Justice Johnson, in delivering the opinion of the court in the case of "The Rapid," 8 Cranch, p. 162, says:

" The object, policy and spirit of the rule, is to cut off all communication or actual locomotive intercourse between individuals of the belligerent States," that "intercourse inconsistent with actual hostility is the offense, against which the operation of the rule is directed."

This intercourse, then, must be such as may involve the transfer of money, property or supplies to or from the enemy's country, or the carrying on of a traitorous correspondence with the enemy, or it does not come within the reason and spirit of the rule.

Now, with reference to these attachment proceedings, we submit that neither in the commencement, nor in any of the proceedings had therein, subsequent thereto, is there anything inconsistent with the above rule.   That there was no act or thing done from the commencement to the close of said proceedings, either by the court or by Mixer himself, which was not proper and right under the circumstances, or which in any manner contravenes either the reason or the letter of the prohibition against intercourse with a public enemy.

It is claimed that Mixer had no right, under the circumstances, to commence the suit at all ; and we are cited, in support of this position, a list of authorities holding that an alien enemy has no right to sue in the courts of the enemy's country.   We do not propose to question the correctness of these

5—53RD ILL.

authorities. This is the law, and why? Because the right to sue involves the right to collect the money, and when so collected, the enemy could depart with it to his own country and use it in the prosecution of the war against the very government whose courts had enabled him to obtain it—hence the rule. But no case can be found which holds that a party can not commence a suit in his own country, against an alien enemy, nor can any such doctrine be found laid down by any writer on international law; and if he may commence a suit, he may prosecute it to judgment, and obtain the money sought to be recovered, if in any way the court can obtain jurisdiction to render the judgment.

So far as the mere commencement of the suit is concerned, there can be no doubt that it was properly commenced, and could not have been dismissed, even if the facts existing had been pleaded in abatement, and in this regard, at least, a citizen should be allowed the same rights as are accorded to alien enemies; and it has been repeatedly held, that where a suit is commenced by an alien enemy, and the plea of alien enemy is interposed, it does not abate the writ or defeat the process entirely, but simply suspends it, and the judgment is that the writ remain without day, until the intercourse or peace of the two nations shall be restored. *Hutchinson* v. *Brock,* 11. Mass. 119; *LeBret* v. *Papillion,* 4 East, 502; *Bell* v. *Chapman,* 10 Johns. 183; *King* v. *Shakespeare,* 10 East, 83; 1 Chitty's pl. 501.

The existence of the war did not forbid the suing of Sibley in our own courts. The rule to be gathered from all of the authorities we submit, is confined to all those acts, dealings and communications which seek to transfer to the enemy's country either money, or property, or traitorous communications, or which may involve, and be used as a cover for the purpose of clandestinely conveying such property, supplies or communications, and can not be held to apply to any of those acts, transactions or communications which do not seek such transfer, and from which the dangers to be apprehended from

such communication and transfer can not arise. *Buchanan* v. *Currey*, 19 Johns. 137; *Clark* v. *Morey*, 10 Johns. 69; *Sparenburgh* v. *Bannatyne*, 1 Bos. & Pull. 163; *Wells* v. *Williams*, 1 Ld. Raym. 282; 1 Salk. 46; *Conn* v. *Penn*, 4 Wash. C. C. R. 441; the same case in 1 Peters, 524; *Denniston* v. *Imbrie*, 3 Wash. C. C. R. 396–403. These cases all show that there was nothing unlawful in the commencement of the suit, as there was nothing in the act obnoxious to the rule.

Messrs. BLANCHARD & MILLARD, also for the appellants, followed, supporting the same view, and insisting that Sibley should have come to this State and attended to his interests, notwithstanding the war, contending that an alien enemy even, coming into the country in time of war, by permission, is allowed to sue—has a standing in court. *Flint* v. *Waters*, 15 East, 260; *Clark* v. *Morey*, 10 Johns. 69; *Buckley* v. *Lyttle*, 10 Johns. 117.

Counsel insisted that a court of equity can not entertain an application of this kind, to enforce the purely legal right of redemption. There was no such "accident," as is contended, as will give the court jurisdiction. Accident, in the sense of a court of equity, is defined as "an occurrence in relation to a contract, which was not anticipated by the parties when the same was entered into, and which gives an undue advantage to one over the other in a court of law." Jeremy's Eq. Jur. B. 3, pt. 2, Introduc. p. 358. But, says Willard, in his work on Equity, page 52, "this definition is defective in not excluding cases of unanticipated occurrences, resulting from the negligence or misconduct of the party seeking relief," and approves the definition of Story as follows: "By the term accident is intended, not merely inevitable casualty, but such *unforeseen* events, misfortunes, losses, acts or omissions as are not the result of any negligence or misconduct of the party."

Messrs. WAITE & CLARKE, for the appellees.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

68      Mixer *et al.* *v.* Sibley *et al.*      [Sept. T.,

Opinion of the Court.

This cause comes before us on an appeal from the superior court of the city of Chicago, wherein Origen Sibley and others, heirs at law of Origen Sibley, deceased, were complainants, and Charles S. Mixer, the Chicago, Burlington & Quincy Railroad Company and others, were defendants.

The case was this: On the thirteenth of May, 1861, Sibley, then a resident of Mobile, in the State of Alabama, made and delivered to Mixer, his promissory note for fifteen hundred dollars, payable to Mixer's order on the first day of December, 1861, at the Southern Bank of Alabama, in that city, on which one hundred and ninety-five dollars had been paid by Sibley before the note matured. Mixer was then, and yet is, a resident of Chicago, and the balance of the note remaining due and unpaid, he instituted, on the eighteenth of July, 1862, in the superior court of that city, a proceeding in attachment to collect the same, alleging, in his affidavit, that Sibley was a resident of the State of Alabama.

The writ of attachment was levied on certain land in Chicago, in which Sibley had an undivided one-eighth interest, and the usual notice by publication was given of the pendency of the suit. No defense being made, a judgment by default was entered against Sibley, for the balance of the note and interest and costs, on which a special *fieri facias* issued, under which a sale was made of the property levied on, and purchased by Mixer for the sum of fourteen hundred and sixty dollars and ninety four cents, and costs, amounting to thirty-two dollars and ten cents; and no redemption having been made, a deed therefor, on the thirtieth of March, 1864, was duly executed by the sheriff to Mixer. The railroad company derive their title through these proceedings.

In October, 1864, Sibley died, leaving the complainants his heirs at law. In October, 1865, they heard of these proceedings in attachment, and on the twentieth of April, 1866, commenced this suit in chancery, to declare them null and void, and to permit them to redeem the property.

It appears that in March, 1865, Mixer filed a bill for partition, in the superior court, for the purpose of having his interest in the property, not sought to be condemned for railroad purposes by the Chicago, Burlington & Quincy Railroad Co., set off to him in severalty, which resulted in setting off to him lot fifteen, in the west half of the southwest quarter of section eighteen, for which he received a deed from the special master, subject to a trust deed he had executed to one Benjamin Skinner and others therefor.

The superior court decreed as prayed in the complainants' bill.

To reverse the decree defendants bring the record here, assigning this decree as error.

The principal, indeed the only ground on which the right to redeem is claimed, is that the proceedings by attachment, from their inception, to their consummation by the execution of the sheriff's deed, were void, for the reason that no such proceedings could be commenced at that time, by a citizen of this State against a citizen of the State of Alabama, by reason of the existence of civil war, to which that State was a party, and on account of the act of congress of July 12, 1861, empowering the President to prohibit, by proclamation, all commercial intercourse between the rebellious and the loyal States, and the proclamation of the President in pursuance thereof, issued August 16, 1861, prohibiting such intercourse.

The proceedings to condemn the land for railroad purposes, are claimed to be within the same objection, so far as the heirs at law of Sibley are concerned.

Another objection is made, that the sale was *en masse*, and otherwise irregular and void.

Much argument and research are exhibited to sustain these propositions, and many authorities cited supposed to sustain them. We have not deemed it necessary, in the view we have taken of this case, to examine all these authorities, believing the only question to be, did the superior court have jurisdiction of the attachment suit, and were the proceedings thereunder regular ?

The question is not, in our judgment, was Sibley an alien enemy at the time, and being so, the proceedings should have been stayed until the termination of the war, but whether, not having been stayed and a judgment actually rendered, is that judgment void for want of jurisdiction? That it was not void, is too plain for argument.

The affidavit and process thereon, duly served, gave the court jurisdiction. These set the court in motion, and it could be arrested only in some way known to the law. The court, perhaps, on its own motion, might have noticed the fact, appearing as it does by the affidavit before them, that Sibley was a resident of a State in rebellion, for the court must judicially know that Alabama was in that condition. No authority has been, or can be shown, that the right to the writ was taken away by the rebellion, or by act of congress, or by the President's proclamation consequent thereupon. Such was not the object of either. Neither was designed to deprive creditors in the adhering States, from the use of all such remedies for the collection of their debts, as the laws of those States gave them. Bringing an action by attachment, is in no sense such commercial or other intercourse as was intended to be prohibited by the congress. We deem argument unnecessary to establish this proposition. Such intercourse as is inconsistent with actual hostility is forbidden, and that, in the opinion of the Supreme Court of the United States, in the case of "The Rapid," 8 Cranch, 155, is not negotiation or contract, but actual locomotive intercourse between individuals of the belligerent States. The mere act of going into an enemy's country is not illegal; any one may go there if the enemy will permit him. By so doing, neither this act of congress nor the President's proclamation would have been violated. The law and the proclamation were aimed at commercial transactions and commercial objects only, and not to arrest the proceedings of courts of justice. Surely, if negotiation or contract was not within the scope of the act of congress or the President's proclamation, bringing a suit can not be.

The court having competent jurisdiction of the attachment suit, and having rendered a judgment therein, the principle is familiar, such judgment binds all parties and privies, wherever they may be. Suppose Mixer had levied his writ of attachment upon personal property of Sibley, being within the jurisdiction of the court, and a regular judgment obtained and a sale had, can it be pretended the title of the purchasers could be divested, for the reason he was an alien enemy? No such case can be found.

The proceedings under the attachment being valid, the irregularities of the railroad company in condemning the land for railroad purposes, can not be questioned by complainants, they having been legally divested of their interest in the property.

The remaining point, that the lands were sold *en masse*, is answered by the case of *McLean County Bank* v. *Flagg*, 31 Ill. 290, where it was said, as between the purchaser and the original parties to the suit, the court would not hesitate to set aside a sale for that reason, if fraud could be perceived in the transaction; but as against innocent second purchasers it has never been done. The cases cited by appellees on this head, are cases against the first purchaser.

The decree of the court below is reversed.

At the September term, 1869, after the foregoing opinion was delivered, upon the petition of the appellees, a re-hearing of this cause was granted.

Messrs. WAITE & CLARKE for the petitioners.

The appellees are entitled, in equity, to have this sale set aside, or to redeem the land, although the statutory time of redemption had expired at the date of the filing of the bill. This right grows out of the peculiar circumstances of the case, and does not call in question the validity of the attachment proceedings. The impossibility of communication between

persons residing in the loyal States and those in the States in rebellion, is ample ground upon which to invoke the aid of a court of chancery. In *Harger* v. *Abbot*, 6 Wallace, 540, justice Clifford says, " neither *laches* nor fraud can be imputed in such a case." We claim that the case falls within the principle governing that branch of equity jurisprudence termed " accident." See 1 Story Eq. Jur. sec. 79, also sec. 9.

In the case of the *Earl of Bath* v. *Sherwin,* 10 Mod. R. 1–3, Lord Cowper lays down the rule that, " equity grants relief when a case is distinguishable from others of the like nature by unusual circumstances." In speaking of this rule thus laid down, Story says the definition is too broad, as it may be unusual circumstances which did not result from the parties' own gross negligence, folly or rashness, but with this restriction, admits the rule of Lord Cowper, 1 Story's Eq. sec. 78, thus conceding a right to relief in a case of a loss growing out of unusual circumstances, but confining that right to a case where the party seeking the relief is free from gross negligence —not ordinary, but gross negligence.

To more clearly understand the full scope of the doctrine laid down in these definitions, we will refer to a few of the many cases to be found in the books, within the principles of which our right to relief is clearly recognized. And in doing so, we shall not regard whether they fall under the head of " mistake," " accident" or " fraud." As Willard, in his work on jurisprudence, page 58, says, what is very true, " that it is difficult to define the technical name of the relief." See *Hamilton* v. *Quimby*, 46 Ill. 90 ; *Quick* v. *Sturtevant*, 2 Paige C. R. 92 ; Fonblanque Eq. 6 note C, also p. 75 ; *Newton* v. *Rouse*, 1 Vernon, 460 ; 1 Story Eq. Jur. 94 ; *Hackett* v. *Pattle*, 6 Mad. Ch. 11 ; *Doty* v. *Whittlsey*, 1 Root, 310 ; *Jones* v. *Woodhull*, Ibid. 293 ; *Crane* v. *Hanks*, Ibid. 468 ; *Doty* v. *Judson*, 2 Root, 427 ; *Maine Bank* v. *Hodgson*, 7 Cranch. 332 ; *Dickinson* v. *Gilland*, 1 Cowen, 500 ; *Hall* v. *Fisher*, 12 Barb. 17 ; *Eastwood* v. *Vinke*, 2 P.Wms. 617 ; 1 Mad. Ch. 46 ; *Croft* v. *Linsly*, 2 Freeman 1 ; 1 Maddocks Ch. p. 23, and cases cited.

But upon the principal question, we contend that under the act of congress and the President's proclamation, forbidding commercial intercourse between the people of the belligerent States, as well as under the general laws of war, the right to sue a party in our own courts who resided in one of the States in rebellion, was suspended during the existence of hostilities. The debtor, residing in one of the belligerent sections, had no right to transfer money in payment of debt, to a person residing in the other section. See the case of *The Hampton,* 5 Wallace 372 ; *LeBret* v. *Papillion,* 4 East, 502 ; *Bell* v. *Chapman,* 10 Johns. 183; 13 Vesey, 72 ; *The Rapid,* 8 Cranch, 155.

We insist we have the right to redeem that portion of the land still owned by Mixer, notwithstanding the statutory period for redemption has expired.

Messrs. WALKER & DEXTER and Messrs. BLANCHARD & MILLARD, for the appellants.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

This application for a re-hearing has caused us to re-examine the grounds on which we placed the opinion to which exception is taken, and after the most careful consideration of the authorities cited, we are well satisfied with the conclusion we reached, that the Superior Court of Chicago possessed full jurisdiction of the attachment cause, and rightfully proceeded, no objection having been interposed, to judgment and execution. All the property of the defendant in the attachment, real and personal, within the jurisdiction of that court, was, notwithstanding the rebellion, subject to its process. Surely, it will not be denied that the defendant himself, though a resident of a belligerent State, would have been liable to the process of that court, had he been found within its jurisdiction.

The bill was filed by the heirs at law of Sibley against Mixer, the judgment creditor in the attachment proceedings, who was also the purchaser under the execution, and against

purchasers from him, who had bought *bona fide*, and with no notice of any infirmity attending Mixer's title. The complainants in the bill alleged, besides the invalidity of the judgment and the subsequent proceedings in the attachment suit, that the property was sold *en masse*, and at a price so greatly below its value, as to raise a presumption of fraud.

This branch of the case was not fully discussed in the opinion, for the reason, it appeared to us, if the judgment was valid, and the proceedings under it regular, a *bona fide* vendee of the purchaser under the execution could not be disturbed in his title by reason of the fact it was so sold. On this part of the case we said, merely, that this objection was answered by the case of *McLean County Bank* v. *Flagg*, 31 Ill. 290, where it was held, as between such purchaser and the original parties to the suit, the court would not hesitate to set aside a sale for that cause, if fraud could be perceived in the transaction ; but as against innocent second purchasers, it never had been done.

The appellees, who are the petitioners for a rehearing, totally disclaim any right to disturb the vendees of the purchaser, but urge· with great force they should be allowed to redeem such portion of the land sold, as has been set off and allotted to Mixer in severalty, being a parcel thereof described as lot or block fifteen, in the west half of the south-west quarter of section eighteen, in township thirty-nine north, range fourteen east.

On this point we invited arguments from both sides. They have been furnished, and have been duly considered, and we will state, briefly, the conclusions we have reached thereon.

It is very apparent, that owing to a state of war, the ancestor of appellees was deprived of very valuable property by proceedings under an execution issued on a judgment in an attachment cause, of the pendency of which, owing to the war, it is said he had no knowledge, and could have had none. His interest in the land sold was an undivided interest of one eighth, and was sold to the judgment creditor at about one

fourth its estimated value when sold.    We are by no means satisfied, from the evidence in the record, that the tract of seventy acres, which it is claimed had, before the sale, been subdivided and surveyed into blocks of ten acres each, that an offering of an undivided eighth of each block would have brought more money than the offering of the undivided interest in the whole tract.    Such was the depressed condition of outside property of this kind at the time of this sale, as not to invite bidders.    The speculative minds of business men were not then turned in that direction, as is inferred from the small sum this property brought.    The sale was a public sale, after due notice, and open to all persons, and no means were used to deter bidders.    It is difficult to understand, if this property was worth so much as is represented, some competition was not excited and a sale made at a much higher sum, a sum nearly equal to its estimated value.    It can not be denied that the creditor was entitled to the proceeds of his judgment, and no great hardship can, ordinarily, result to the owner of land sold under an execution, at a price greatly below its value, for the reason that the law allows him twelve months in which to redeem the land, and thus escape injury.    *Phelps* v. *Conover*, 25 Ill. 309.    That it brought a sum so small must be referred to the fact that an undivided eighth interest in real estate of that description, was not a favorite at that time with those who had money to invest.

To say that land within the chartered limits of Chicago, now estimated to be worth twenty thousand dollars or more, was sacrificed, when sold at sheriff's sale eight years ago, for a very small sum, would be saying more than existing facts warrant. We do not think mere inadequacy of price, great as this may have been, would be sufficient, of itself, to set aside a sale in any case where the right of redemption is given, unless there are some indications of fraudulent practice, or some advantage taken against the debtor not warranted by law.

The question of redemption of the tract remaining to Mixer, is presented to us in two aspects—the one, as it regards the

judgment debtor, the other, the petitioners, his heirs at law, some of whom are minors.

The sale took place on the thirteenth of December, 1862, at which time the rebellion was rampant, and intercourse between the citizens of the different States attended with great difficulty and some danger to life. The time of redemption expired on the thirteenth of December, 1863, the rebellion still active. It is not to be presumed Sibley himself would have suffered the time of redemption to expire in view of the large value of this property, and the comparatively small sum for which it sold. The accident of war prevented any effort on his part to this end. He died in the State of Alabama in October, 1864, about ten months after the sheriff had executed a deed to Mixer, the war still raging with undiminished fury. No blame, therefore, can be attached to Sibley for failing to make redemption in his life time. Hostilities did not cease until the thirteenth day of June, 1865, the date of the President's proclamation to that effect, and this bill was filed in April, 1866, less than one year thereafter.

The heirs at law of Sibley, who file this bill, continue to reside in the Confederate States, where they have always resided, and they could not, after the death of Sibley, while the war continued, leave their domicil for this State without great hazard, for any purpose. The highest judicial tribunal in the United States has held, that during the late rebellion the operation of the statute of limitations was suspended. *Harger* v. *Abbot*, 6 Wallace, 332 ; and the doctrine recognized by this court in *Stiles* v. *Easley*, 51 Ill. 275. The fact of inaccessibility may be considered the true reason why this statute has been held to be suspended during a time of war. When it is physically impossible for a party to perform an act, it is compatible neither with reason nor justice that he should be held guilty of *laches* for non-performance of the act. If a party can not be said to be in fault for not commencing a suit, because of the condition of the belligerent States, how in reason and justice should a party be made to suffer, because he

did not or could not do another act no more feasible or practicable? A state of war in the one case, as in the other, renders it proper and just that in theory, at least, the efflux of time shall be considered as suspended, so far as the exercise of the right of redemption is concerned. We can not perceive why the same doctrine should not apply to save another right which could not, for the same reason, be exercised during the continuance of the war. The *vis major* was as potential in the one case as in the other.

We, therefore, are inclined to hold, in analogy to the statute of limitations, that the efflux of time as to redemption was suspended during the continuance of hostilities. The bill was filed within one year after the disability was removed.

But it may be said that redemption is a strict legal right, having no element of equity, strictly speaking, and therefore the right to redeem, if it exists at all, can alone be enforced through the courts of law.

Courts of equity are often called upon to give effect to strict legal rights; as an instance—the right to sell a debtor's land on a *fi. fa.* is a strict legal right created by statute—as much so, certainly, as the right to redeem from that sale. Now it is often necessary to apply to a court of equity for aid, before a party can exercise this purely legal right to sell the debtor's property on execution. A familiar example is, where the debtor's property has been incumbered by putting upon it an apparent legal title in some other person, so that there is, legally, nothing on which the execution can take hold. Then it is that the powers of a court of equity are invoked to interpose and remove the obstruction. It may be said, generally, that when the exercise of a purely legal right is obstructed by some existing impediment, which prevents the exercise of the right, then equity will step in and remove the difficulty, and allow the legal right to be exercised, as if such difficulty or impediment had never existed.

This, it seems to us, is such a case. Here we find a sheriff's deed standing in the way. This obstructs the power to redeem

without first calling upon a court of equity to remove the obstruction ; and it can be removed only in a court of equity, by the exercise of its general and undoubted jurisdiction.

This being a case properly calling upon a court of equity to interfere, by another equally familiar principle of equity jurisdiction, such court will not limit itself to the exercise of partial justice, and then turn the party over to a court of law, but while it has control of the case will dispose of the whole subject and do complete justice between the parties, and thus put an end to litigation.

What shall be complete justice between these parties, as the case now stands, is a question not entirely free from difficulty.

The appellees claim, and it does not appear to be disputed, that Mixer, by his sale of a portion of these lands, has received five or six hundred dollars more than the amount of his judgment and costs and interest.   It also appears that he has been at considerable expense in procuring a partition of the land. As the record discloses nothing showing bad faith on his part in obtaining the judgment, or in his purchase at the sheriff's sale, we do not think the demands of equity require that he should account for such surplus, if it be true that he has received any over and above his judgment, interest and costs. If, on the contrary, the amount received by him does not equal the amount of his judgment, interest and costs, then appellees should pay to Mixer whatever balance of the judgment, interest and costs may remain unpaid ; on paying which, or if the receipts by Mixer on the sale he has made, shall equal or exceed the amount of his recovery, together with the interest and costs, then Mixer must release his title to lot or block fifteen, in section eighteen, allotted to him in partition, to the appellees, and he will be required to remove, at his own proper costs and charges, any incumbrance he may have placed upon this lot.   Mixer will also be allowed for all taxes and assessments he may have paid upon the lot, and for other necessary expenses attending the same.   This we deem a full compliance with all the demands of equity, as they appear to us.   As

to the purchasers by absolute deed from Mixer, we remain of the opinion heretofore expressed. Their equities are fully equal to those of the appellees, and their title is in no event to be disturbed.

The decree of the court below is reversed, and the cause remanded, with directions to the superior court, after ascertaining the state of the account between these parties as herein specified and limited, to enter a decree in conformity to this opinion.

*Decree reversed.*