Deadebick, J.,
delivered the opinion of the court-.
This suit was brought by Sugarman against' Lacy ■& McGhee in the Law Court of Memphis, upon the following bill of exchange:—
$4,000. Carson’s Landing, Feb. 2, 1865.
At sight pay to J. Sugerman four thousand dollars, and charge to my account. G. T. Torry. To Lacy & McGhee, Memphis, Tenn.”
This bill was soon after presented to Lacy & Mc-Ghee, and was conditionally accepted in writing, thus:— Accepted, — payable when the cotton on which it is predicated is sold. Lacy & McGhee.”
It appears that Lacy & McGhee were traders residing in Memphis, and wer.e owners of the steamboat “Lady,” upon which they brought cotton from Mississippi, and perhaps elsewhere, consigned by, or purchased from, the planters of the surrounding country, *356 to Memphis. At the time of the transactions involved" in this suit, Memphis was in the permanent occupation of the Federal forces, and Carson’s Landing in Mississippi, as some of the witnesses state, was within the Confederate lines, or under the control of Confederate soldiers. Terry had consigned for sale to Lacy & McGhee two hundred and two bales of cotton, and in- February, 1865, Lacy landed with his boat at Carson’s Landing,- having on board one Frank, who, as well as the plaintiffs and the defendant in error, was a citizen of Memphis. While at Carson’s Landing, the bill in question was drawn by Torry.
Frank had some merchandize on board the boat and sold it to Torry, and also sold him some greenbacks and gold, and gave him credit for an old account, and for this Torry drew the bill for §4,000 on Lacy <fc -McGhee. Frank was indebted to Sugerman in an amount greater than §4,000; and, at his instance, Torry drew the bill in favor of Sugarman and delivered it to Frank, Lacy agreeing verbally to accept it.
Such is the history of the origin of the bill, as given by Frank; and there is nothing in the record to contradict him in any material fact. While these negotiations were going on between Frank and Torry, who owned a plantation on which he lived, two miles from the landing, a Federal gunboat was lying at the landing, protecting the steamer.
It was also in proof,. that while at the landing,. Torry promised Lacy to consign him soon thereafter one hundred and fifty bales of cotton, in addition to the two hundred and two bales already consigned.
*357 Upon the return of the boat to Memphis, Frank delivered the bill to Sugarman, and went with him to Lacy & McGhee, to get their acceptance of it. "When Sugarman presented the bill to Lacy for acceptance, Lacy said that he could not pay the, draft until the cotton was sold. Frank then told Sugarman he had 'better have it accepted, as Torry owed a great deal of money, and some one might attach the cotton before it was sold. Lacy then accepted it in the manner already stated.
Having subsequently refused to pay the acceptance, Sugarman brought suit upon it, and obtained judgment in the Law Court of Memphis, from which Lacy & McGhee have appealed to this court.
It is insisted that, Memphis being within the Federal lines and Carson’s Landing within the Confederate lines, all commercial intercourse between persons residing at these places, respectively, was prohibited by general law, as well as by express interdiction of the respective belligerents; and that the bill drawn by Torry upon Lacy & McGhee, having its origin in the unlawful traffic between Frank and Torry, was void, except in the hands of an innocent holder for value in due course of trade and without notice. That Frank had no permit to trade at all, and that the sale of gold, except for military purposes, was absolutely prohibited. See Treas. Reg. July 30, 1864, p. 72, sec. 32; and p. 46, sec. 22.
For the plaintiff below it was insisted that Torry’s was a registered plantation, or one within the lines of occupation of the military forces of the United *358 States, as indicated by a published order of the General • commanding .the district or department so occupied ; and that Torry might lawfully sell or consign-his cotton to Lacy & McGhee in Memphis, and draw a bill upon them for the price, or proceeds of sale.
Section 4 of the act of Congress of the United States, of July 2; 1864, prohibited commercial intercourse between persons in States in insurrection within the lines of military occupation of the Federal forces,, and those in the insurrectionary States not within the Federal lines. And section 9 of that act repealed so much of the act of July 13, 1861, as authorized the President to license or permit commercial relations in any State or section the inhabitants of which were declared in insurrection, “except so far as may be necessary to authorize supplying the necessities of loyal persons residing in insurrectionary States within the lines of actual occupation by the military forces of the United States' as indicated by published order of the-commanding General of the department or district so-occupied, and also except so far as may be necessary to authorize persons residing within such lines to bring or send to market in the loyal States any products, which they shall have produced with their own labor or the labor of freedmen, or others employed by-them, etc.”
Pursuant to this act of Congress, certain “Pules and Regulations” were adopted by the executive proclamation of July 30, 1864, which absolutely prohibited all' commercial intercourse with localities beyond the lines of actual military occupation by United States forces..
*359 These regulations authorized certain officers to issue permits to take supplies to loyal persons within the lines of actual military occupation, and required such officers to ascertain from the published order of the General commanding the department embracing his agency, the lines of actual occupation by the United States military forces, and he was restricted from granting permits extending beyond those lines.
The application for such permit was to be in writing, accompanied by an affidavit of the applicant, the form of which was prescribed in the regulations. Upon this a written permit might be issued.
Similar requirements and proceedings obtained upon an application for a permit by loyal persons within the Federal lines in an insurrectionary State.
In 1 Kent’s Com., pages 66 to 69, the doctrine of non-intercourse between the citizens or subjects of two countries at war with each other, is declared in the most emphatic terms; the declaration of war resulting in the absolute interruption and interdiction of all commercial correspondence, intercourse, and dealing between the citizens of the two countries. It is said, that “to suffer individuals to carry on friendly or commercial intercourse, while the two governments are at war, would be placing the act of the government and the acts of individuals in contradiction to each other. It would counteract the operations of war, throw obstacles in the way of public efforts, and lead to disorder, imbecility, and treason. Trading supposes the existence of civil contracts and relations, and a reference to courts of justice.It affords aid to *360 the enemy, in an effectual manner, by enabling the merchants of the enemy’s country to support their government, and it facilitates the means of conveying intelligence and carrying on a traitorous correspondence with the enemy.”
“It follows, therefore, as a necessary consequence of the doctrine of the illegality of all intercourse or traffic without express permission, that all contracts with the enemy made during the war are utterly void. The insurance of enemy’s property is an illegal contract. So is the drawing of a bill of exchange by an alien enemy on a subject of the adverse country, or the purchase of bills on the enemy’s country, or the transmission and deposit of funds there; because it may be cherishing the resources, and relieving the wants, of the enemy. So the remission of bills or funds in money to subjects of the enemy, is unlawful. All artifices to trade with the enemy through third persons or partnerships, are equally illegal without express permission.”
This rule has been held, in the British Admiralty, to prohibit a remittance of supplies to a necessitous British colony during its temporary subjection to the enemy. Ibid, 68.
In the case of “The Rapid,” 8 Cranch, 155, it was decided in 1814, that a citizen of the United States who had purchased goods in England before the war of 1812 was declared, and deposited them upon a small British island, could not, after the declaration of war, send a vessel to the island to bring his goods to the United States; the court holding, “that the object, *361 policy, and spirit, of the rule, is to cut off all communication or locomotive intercourse between individuals of the belligerent States.”
In the case of the United States v. Lane, the several acts of Congress, and the Treasury Regulations, in respect to commercial intercourse with the insurrectionary States, are construed.
Lane contracted with the Treasury Agent at Nor-fold, Virginia, then held by the Federal forces, to deliver to him a large quantity of cotton, which was then on the Chowan River in North Carolina, and within the lines held by the insurrectionary forces. The commander of the military district gave a safe conduct to Lane, his vessel, and crew, to bring out the cotton. Lane also had a license to take out certain articles.
On the return voyage, Lane’s vessel was seized by the United States authorities for being engaged in illegal traffic with the enemy. The United States Supreme Court held the contract with Lane unlawful, and the seizure of his vessel and cargo rightful, .,s well upon the principles of public law, as because the trading was prohibited by the acts of Congress and the Treasury Regulations.
Mr. Justice Davis, delivering the opinion of the conrt, said :—
“At the time this contract purports to have been made, this country was engaged in a war with a formidable enemy; and by a universally recognized principle of public law, commercial intercourse between States at war with each other is interdicted. It needs *362 no special declaration on the part of the sovereign, to-accomplish this result; for it follows from the very nature oí war, that trading between belligerents should cease. If commercial intercourse were allowable, it would oftentimes be used as a color ior intercourse of a different character, and in such a case the mischievous consequences 'that would ensue can readily be-foreseen.” 8 Wallace, 195.
In the still later case of Maddox v. The United States, 15 Wallace, 60, the court re-affirmed the opinion in 8 Wallace, and declared that “private citizens were prohibited from trading at all in the insurrectionary districts.”
In the case of The Ouachita Cotton, 6 Wallace, 521, the United States Supreme Court declared void “all purchases of cotton from the rebel Confederacy by citizens or corporations of New Orleans afcer May 6th, 1862, from which date the restoration of national authority had fixed upon them the-same disabilities as to commercial intercourse with the territory declared to be in insurrection, as it had previously fixed upon the inhabitants of loyal States.”
In the case of Rhodes v. Summerhill, 4 Heis., 205, a contract to transport cotton from the Confederate into the Federal lines, for sale, was held “illegal and void,” upon principles of international law, and because it was contrary to the well known public policy of the Confederate States as a de facto government, and contrary to the laws of war as promulgated by the United States, and to various acts of Congress enacted during the war, to prohibit commercial intercourse with *363 tbe States engaged in insurrection;” e. g., the act of Congress of July 2, 1864, and the Treasury Regulations thereunder.
It was, therefore, a material question at the trial in the court below, whether the contract for the sale of the cotton and the drawing of the bill of exchange by Torry, were acts done within the Confederate or the Federal lines of military occupation, and whether Torry’s was a registered plantation.
Leftwitch testified, upon his examination in chief,, that Carson’s Landing, except during the presence of a gun-boat, was in February and March, 1865, in possession of the Confederate soldiers. Upon his cross-examination by the plaintiff below, he stated that Tor-ry’s plantation was a registered plantation at the time when he shipped his cotton to Lacy & McGhee.
The defendant objected to the proof being made-by parol, upon the ground that if the fact was so, there was written evidence of it.
The fact of the actual occupation of any particular locality by either party, when it becomes material to be inquired into, may be established by parol evidence. But if it is insisted that any published order has been issued as required by the United States Regulations-defining the boundaries or lines of the military occupation, then such published order, if to be had, shall be produced, as being the best evidence of the fact, or its absence accounted for, when secondary evidence would be admissible.
But to allow parol evidence of a fact of which-there is, or was, written or printed evidence, without *364 any excuse for not producing the primary evidence of the fact sought to be proved, is erroneous.
Some evidence should he adduced to show that an effort was made to produce the primary evidence, and when it is beyond the reach of the party, or it is, for any reason, impracticable to obtain it, the court would then allow secondary evidence.
So a permit to trade within the Federal lines, necessarily being in writing, should be produced; or if the party to whom it issued fail on proper notice to produce it, parol evidence of its contents is admissible.
The acts of Congress and the Treasury Regulations prohibited, with some exceptions, commercial intercourse with insurrectionary States. This made “prohibition the rule, and license the exception,” and put the burden of proof upon the party relying upon the license. 6 Wallace, 531.
The plaintiffs, upon the trial, might prove the declarations of the defendants, that they had received a permit; but, if objection were made at the trial, parol evidence of its contents could not be heard.
If it should turn out that the bill of exchange was invalid as between Torry and Lacy & Ghee; yet, if Sugarman took it in due course of trade, for value, upon the acceptance of Lacy & McGhee, without any participation in, or knowledge of, its illegality, or knowledge of facts sufficient to put him upon inquiry, he would be an innocent holder, and might recover upon the acceptance. 3 Kent, 86, and note b.; Story on Bills, sec. 104.
The acceptance being conditional, it was incumbent *365 on the plaintiff below to show that the condition was fulfilled.
The court charged the jury that they might look to all the proof in the case, to determine the question upon what cotton the acceptance was predicated; but refused to charge, on the request of the defendants,— “ That if it appeared from the proof that Lacy & Mc-Ghee claimed a large balance of account against Torry, and that Torry was in embarrassed circumstances, this would be a circumstance they could look to in determining this question.”
The charge requested was proper, and pertinent to the question, and should have been given, although it may appear that the charge given in effect, included the instruction asked for, as the judge told the jury that they might look to all the proof. But there is much of that proof irrelevant as to the particular question of the cotton drawn on, and the refusal of the court to give the instruction asked for,, probably led them to believe that they were not to consider the facts recited, or that these had no bearing on the question.
The judgment must be reversed, and a new trial' granted.