SEMMES (BURNS v.). See Case No. 2,183.

---

## Case No. 12,651.

### SEMMES v. CITY FIRE INS. CO.

[6 Blatchf. 445; [1] 8 Am. Law Reg. (N. S.) 673; 36 Conn. 543; 2 Am. Law T. Rep. U. S. Cts. 179; 2 Chi. Leg. News, 17.]

Circuit Court, D. Connecticut. June 12, 1869.[2]

WAR—EFFECT UPON CONTRACTS — LIMITATIONS OF ACTIONS—WHEN CIVIL WAR COMMENCED AND TERMINATED.

1. A state of war, recognized as such by and between the belligerent parties, suspends all contracts in existence between the citizens of the respective belligerents at the time the war commenced.

[Cited in Brown v. Hiatt, Case No. 2,011.]

2. Upon the termination of the war, obligations contracted before its commencement, between the respective citizens, though the remedy for their recovery is suspended during the war, are revived.

3. Where a policy of insurance against fire was issued by C., in Connecticut, in August, 1860, to L., a resident of Mississippi, on a building in the latter state, and a total loss occurred in January, 1861, during the life of the policy, and the policy contained a condition that no suit should be sustainable on it unless brought within twelve months after a loss, and this suit was brought on it in October, 1866, held, that the contract of insurance, with all its incidents, including said condition, and all rights of action under the policy, were suspended during the continuance of the war which commenced, after said loss, between the so-called Confederate States, of which Mississippi was one, and the United States.

[Cited in Brown v. Hiatt, Case No. 2,011; Kanawha Coal Co. v. Kanawha & O. Coal Co., Id. 7,606.]

4. In determining when the rights suspended by such war revived, recourse can only be had to the government of the United States, as the war was a civil war, in which the so-called Confederate States were defeated, and their organization, as a de facto government, was politically annihilated.

5. The courts of the United States, in ascertaining when such war ceased, must look exclusively to the action of the president, or congress, or both.

6. The president had authority to issue his proclamation of June 13, 1865, (13 Stat. 763), removing the restrictions upon intercourse with the

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2] [Affirmed in 6 Wall. (73 U. S.) 327.]

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Reversed in 13 Wall. (80 U. S.) 158.]

states east of the Mississippi river, which had been in rebellion.

7. By virtue of that proclamation, the said contract of insurance, though suspended during the war, revived on the 13th of June, 1865, and was, from that date, in full force, with the right to sue upon it.

[Cited in Perkins v. Rogers, 35 Ind. 156; Seymour v. Bailey, 66 Ill. 300.]

8. This suit, not having been brought within the time limited by the policy, exclusive of the whole period of disability, was held not to be maintainable.

This was a suit, commenced October 31, 1866, on a policy of insurance against fire, issued by the defendants to William R. Luckett, of Mississippi, August 3, 1860, upon a building situated at the Artesian Springs, in Madison county, in that state. It was tried before the court, without a jury. It was conceded that a total loss occurred on the 5th of January, 1861, during the life of the policy, that the assured subsequently died, and that the defendants were liable to his administrator [John T. Semmes], in this suit, unless the right to recover was barred by lapse of time. Among the conditions attached to, and making part of, the policy, was the following: "It is furthermore expressly provided, that no suit or action of any kind against said company, for the recovery of any claim upon, or by virtue of, this policy, shall be sustainable in any court of law or chancery, unless such suit or action shall be commenced within the term of twelve months next after any loss or damage shall occur; and, in case any such suit or action shall be commenced against said company after the expiration of twelve months next after such loss or damage shall have occurred, the lapse of time shall be taken and deemed conclusive evidence against the validity of the claim thereby so attempted to be enforced." The defendants pleaded in bar the above condition in the policy. To this plea the plaintiff replied, setting up the following matters, by way of answer thereto: (1) That, though the loss happened on the 5th of January, 1861, yet the defendants were, by the terms of the policy, to have sixty days after notice and proofs of loss within which to make payment, and that the assured, though then in life, could bring no action on the policy till after the lapse of the sixty days. (2) That the policy was delivered, and the contract therein was made and to be performed, in the state of Mississippi, where the assured continued to reside until his death, and where his administrator had since resided; that the policy was made under, and with express reference to, a certain statute of said state, whereby it was the duty of the defendants to keep, during the life of the policy, an agent in that state, upon whom service of process might be made, and also funds in the same state, from which any loss which might occur might be paid or collected; that the defendants, in January, 1861, wrongfully revoked and discontinued their agency in that state, and withdrew all their funds therefrom, and, from that time to the commencement of the suit, had had neither agent nor funds therein, whereby the plaintiff had been wrongfully deprived of all means of instituting or prosecuting any action in that state, and of procuring therein any adjustment or satisfaction of the loss. (3) That the assured, down to the time of his death, was a resident and citizen of the state of Mississippi, and that the plaintiff, during his whole life, had been and still was a resident and citizen of the same state; and that, from April 15, 1861, to April 2, 1866, a state of war between the so-called Confederate States, including the state of Mississippi, and the United States, existed, whereby all right of the assured during his life, and of his administrator since his death, to maintain any action against the defendants, was by law suspended, during all that time. The defendants traversed the replication.

The court found the following facts: (1) That the assured, from the date of the policy until his death, April 6, 1865, was a citizen of, and actually resided in, the state of Mississippi; and that the plaintiff was his administrator, duly appointed and qualified in said state, and had, during all his life, been a citizen thereof, and an actual resident therein. (2) That the plaintiff had taken out ancillary letters of administration in the state of Connecticut. (3) That the loss against which the policy provided occurred on the 5th of January, 1861, and had never been paid. (4) That the notice and proofs of loss required by the policy were duly furnished to the defendants; and that the sixty days therefrom expired April 11, 1861. (5) That, from the date of the policy to the 23d of January, 1861, the defendants had an agent and funds in Mississippi, as required by the law of that state; that, on the last-named day, they revoked the powers of their agent, so far as they could legally revoke the same, and had never appointed any other; and that, on the same day, they withdrew all their funds from said state, and since then had had therein no funds, nor any agent authorized to accept service of process, unless that power of their former agent continued, notwithstanding the defendants' formal revocation thereof.

William Hammersley and Henry K. W. Welch, for plaintiff.

Charles R. Chapman and Alvan P. Hyde, for defendants.

SHIPMAN, District Judge. I pass the question whether the year in which the plaintiff, or his intestate, was bound, by the condition in the policy, to commence suit or be barred a recovery, commenced to run upon the lapse of sixty days after the proofs of loss were furnished, as the result at which I have arrived renders that question immaterial.

The fact alleged in the replication and found by the court, that the defendants revoked, or rather attempted to revoke, the power of their agent in Mississippi to accept service, may, also, be dismissed. If I should assume, as the plaintiff claims, that the law of Mississippi on

the subject controlled the rights of the parties under the contract on this point, it would not support the inference which the plaintiff seeks to draw. There is no allegation that the agent personally left the state. The presumption, therefore, is that he remained there. If the law of Mississippi was binding on the defendants, requiring them to continue an agent in that state empowered to accept service, or upon whom service might be made, during the life of this policy, and until the loss under it should be paid, then the agent in question must be deemed to have possessed that power. The defendants conferred it upon him, and he continued to represent them in that capacity till January 23, 1861, as is conceded on all hands. But it is found that they revoked this power of their agent on the last-named date, so far as they could. Yet, if the plaintiff's claim, that the statute of Mississippi on this subject made part of this contract of insurance, is good, then the defendants could not revoke this part of the agent's authority. One party alone cannot change a stipulation in a contract, either express or implied, which is to enure to the benefit of another. Assuming, then, merely for the purposes of this question, that the main legal proposition of the plaintiff on this point is correct, it follows that the power of the agent, or, to speak more accurately, his character as the representative of the defendants in this matter, still remained, notwithstanding their attempt to revoke it. Service that would have bound the defendants could still have been made on him. The suit could have been brought in Mississippi within the twelve months, as provided in the condition, free from any difficulty on this point.

Then, as to the withdrawal of their funds by the defendants. Whatever embarrassment this would have caused to the plaintiff or his intestate, it could not prevent or delay him from bringing his suit, and thus complying with the condition. He could have merged his claim in a judgment, and then pursued satisfaction in any other forum where property could have been found, unembarrassed by this twelve months' restriction. I advert but briefly to these points, as they were not pressed on the argument.

But a question of much more magnitude and difficulty remains to be considered. The replication sets up the late Rebellion, and alleges that a state of war existed between the organization known as the Confederate States, including the state of Mississippi, and the United States, from the 15th of April, 1861, to the 2d of April, 1866, whereby it is claimed that this contract, and all right to sue upon it, was, during all that time, suspended. There is no allegation that the courts of Mississippi, or the national courts in that state, were closed for any specific length of time, or that the plaintiff, or his intestate, labored under any personal disability, arising out of his actual participation in the war, or that he was under the control of any vis major, beyond

what the law implies from the state of war. The whole question, therefore, turns on the legal consequences of the war, in their operation on this contract, and the length of time these consequences continued.

It is, of course, conceded, that a state of war, recognized as such by and between the belligerent parties, suspends all contracts in existence between the citizens of the respective belligerents at the time the war commences. The authorities are uniform on this subject. The general rule is well stated by Mr. Justice Nelson, in the Prize Cases, 2 Black [67 U. S.] 635, 687: "The legal consequences resulting from a state of war between two countries at this day, are well understood, and will be found described in every approved work on the subject of international law. The people of the two countries become immediately the enemies of each other—all intercourse, commercial or otherwise, between them, unlawful —all contracts existing at the commencement of the war suspended, and all made during its existence utterly void." This doctrine has been repeatedly recognized and applied to our late civil war by the courts of this country, both state and national. Hanger v. Abbott, 6 Wall. [73 U. S.] 532; Tucker v. Watson, 6 Am. Law Reg. [N. S.] 220; Jackson Ins. Co. v. Stewart [Case No. 7,152]; Conn. Mut. Life Ins. Co. v. Hall [68 Ill. 357].

It is equally well settled, that, upon the termination of the war, obligations contracted before its commencement between the respective subjects, though the remedy for their recovery is suspended during the war, are revived. Lawr. Wheat. (2d Ed.) p. 877, pt. 4, c. 4, and the cases above cited. In Hanger v. Abbott and Jackson Ins. Co. v. Stewart this doctrine was applied to statutes of limitation. In the former case, Mr. Justice Clifford, speaking for the court, says: "Where a debt has not been confiscated, the rule is undoubted, that the right to sue revives on the restoration of peace; and Mr. Chitty says, that, with the return of peace, we return to the creditor the right and the remedy. Unless we return the remedy with the right, the pretence of restoring the latter is a mockery, as the power to exercise it with effect is gone by lapse of time during which both the right and the remedy were suspended."

Applying these doctrines to the present case, it follows, that the war in which the people of Mississippi on one side, and those of Connecticut on the other, participated, suspended this contract with all its incidents, including the condition set up in bar of this action, and all rights of action under it. In view of the result to which I have come, it is unnecessary to determine the precise date of the beginning of the war, when this suspension commenced. It is immaterial whether we take the 15th of April, 1861, as stated in the replication; or the date of the president's proclamation (12 Stat. 1258), calling for volunteers; or the 19th of April, 1861, when, by proclamation (Id.), he declared that an

insurrection had broken out in certain states. including Mississippi, and declared his purpose to blockade their ports; or the 16th of August, 1861, when, in pursuance of the act of congress of July 13, 1861 (12 Stat. 255), he, by proclamation (Id. 1262), formally declared the inhabitants of those states in insurrection, and announced the prohibition of all commercial intercourse between them and the inhabitants of the other parts of the United States. It is conceded, on all hands, that, at least from August 16, 1861, this contract was suspended, both by the inevitable legal effect of the state of war, and by the interdiction of intercourse announced by the proclamation of that date. The rules of public law, as well as the act of congress referred to, lead to this result. Therefore, as the twelve months within which a suit could be legally brought on this policy had not expired when the war commenced, and thus imposed a disability on the assured, it becomes essential to determine whether this disability has been removed, and, if so, when that removal took place. It is conceded, in this case, that the disability has been removed, and the right to sue revived. The plaintiff not only admits, but must maintain, that this took place before October 31, 1866, when he brought this suit. Otherwise, he could have no standing in court. As the contract, and all remedies under it, were absolutely suspended by the war, no suit could have been brought while that suspension continued. But the plaintiff goes further, and alleges, in effect, in his replication, that the war ended, so far as the state of Mississippi and its inhabitants are concerned, on the 2d of April, 1866, the date of the president's proclamation (14 Stat. 811), to that effect, and not before. On the other hand, the defendants insist, that it ended as early as June 13, 1865, when the president, by proclamation (13 Stat. 761), appointed a provisional governor over the state of Mississippi, and directed the United States district judge for that judicial district to proceed to hold the courts.

Now, it must be remembered, that, though this was a war between belligerents, attended, while it continued, by those legal consequences which public law always attaches to legitimate warfare, yet it was a civil war, in which the revolted party was defeated, and its organization as a de facto government, under the name of the Confederate States of America, politically annihilated. No treaty of peace, in the ordinary sense of that term, could have been negotiated, as but one of the parties which had waged the war was in existence, at its close, as a treaty-making power. Therefore, no such treaty has drawn the line where the war ended, and suspended contracts revived. We must, therefore, look to the acts of the only surviving party, to ascertain when those disabilities, legally imposed by the state of war, ceased. It is hardly necessary for me to say, that the principle here stated lends no support to the

doctrine put forth in some quarters, and which that distinguished jurist, Mr. Justice Sprague, characterized as a "grave and dangerous error"—that the suppression of the Rebellion conferred upon the United States the rights of conquest—the right to treat the states included in the Rebellion as foreign territory acquired by arms, and to permanently divest them and their inhabitants of all political privileges. The Amy Warwick [Case No. 342]. That notion has nothing to do with the point now under consideration. The United States, in suppressing the Rebellion, destroyed the political organization known as the Confederate States, and not the individual states as political communities. But, though the states remained after the contest ended, the belligerent power known as the Confederate States, which had represented them in the war, disappeared at its close. Neither of the states which remained had the power, or attempted, to negotiate a treaty of peace with the United States. In determining, therefore, when the rights suspended by the war revived, we must look to the action of the only power in existence which could effectually deal with that subject. This power was the government of the United States.

It is a settled rule with the courts of the United States, in ascertaining whether or not war exists, to look to the action of those departments of the government to which that subject is confided by the constitution. Courts never inquire, when investigating questions of this character, when active hostilities ceased. The termination of war, and the establishment of the relations of peace, are political acts, to be performed exclusively by the departments of the government to which political powers and duties are entrusted. The action of those departments, when within the authority conferred by the constitution, is conclusive and binding on the courts as well as on citizens. When war has existed between the United States and a foreign country, its termination is easily ascertained by a reference to the treaty of peace which follows it, and which is consummated by the president, acting by and with the advice and consent of two-thirds of the senate. As no such treaty did, or could, mark the close of this civil war, we must look to the action of the president, or congress, or both, and from that action ascertain when the war ended, and when the legal consequences which flowed from it ceased to act in any given case.

I have already shown, that, by the rules of public law universally recognized among civilized nations, as well as by the decisions of our own courts, the existence of this war suspended all contracts between the citizens of the respective belligerents, entered into before it commenced. It rendered, for the time being, all commercial intercourse between the citizens of the two sections unlawful, and converted them into enemies. But, in addition to this, congress, on the 13th of July, 1861, pass-

ed the act, before mentioned, authorizing the president, in certain cases, by proclamation, to declare the inhabitants of a state in insurrection against the United States, whereupon all commercial intercourse by and between the same and the citizens thereof, and the citizens of the rest of the United States, should become unlawful. In pursuance of that statute, the president, on the 16th of August, 1861, issued the proclamation before mentioned, declaring the inhabitants of certain states, including Mississippi, in insurrection against the United States. By force of this proclamation, then, and the statute authorizing it, as well as by the legal effect of the war then existing, all pre-existing contracts between the people of the respective belligerents, including the right to enforce them by judicial proceedings, were thenceforth suspended. In progress of time, hostilities ceased, and the executive department of the United States commenced a series of acts recognizing a change in the relations of the government towards the inhabitants of the states lately in rebellion. On the 22d of May, 1865, the president issued a proclamation (13 Stat. 757), raising the blockade of most of the closed ports, and removing "all restrictions upon trade heretofore imposed in the territory of the United States east of the Mississippi river, save those relating to contraband of war, to the reservation of the rights of the United States to property purchased in the territory of an enemy, and to the twenty-five per cent. upon purchases of cotton." The same proclamation declared that all provisions of the internal revenue law should be carried into effect under the proper officers. On the 29th of May, 1865, the president proclaimed (Id. 758) amnesty and pardon to all persons in the late revolted states, except certain specified classes, with restoration of all rights of property, except as to slaves, and except in cases where legal proceedings had been commenced for the confiscation of property of persons engaged in rebellion, on condition that they should take and subscribe a certain oath. On the same day he issued a proclamation (Id. 760), appointing a provisional governor for North Carolina, and prescribing his duty and authority. On the 13th of June, 1865, he issued a similar proclamation, before referred to, relating to Mississippi. On the same day he issued a proclamation (Id. 763), appointing a provisional governor over Tennessee, and declaring, among other things, "that all restrictions upon internal, domestic, and coastwise intercourse and trade, and upon the removal of the products of states heretofore declared in insurrection, reserving and excepting only those relating to contraband of war, as hereinafter recited, and also those which relate to the reservation of the rights of the United States to property purchased in the territory of an enemy, heretofore imposed in the territory of the United States east of the Mississippi river, are annulled, and I do hereby direct that they be forthwith removed." The other provisions of this proclamation it is

not necessary to notice here. On the 2d of April, 1866, the president issued a proclamation, before cited, formally declaring the insurrection that had existed in certain states, including Mississippi, at an end, and to be thenceforth so regarded. It should be remarked, that there was no executive declaration, before that of April 2, 1866, that the insurrection was ended in any state, except Tennessee. On the 13th of June, 1865, the president did, in the proclamation already cited, declare it terminated in the last-named state. In the proclamation of the same date relating to Mississippi, and in the one of May 29, 1865, relating to North Carolina, he spoke of the armed forces of the Rebellion as having been "almost entirely overcome."

We must now inquire into the legal character of the proclamations of the president restoring commercial intercourse between the states which had been engaged in the Rebellion and the rest of the United States. And, first, as to his authority to issue such proclamations. I think there can be no doubt on that point. The supreme court of the United States has recognized the power of the president to, in effect, declare the inhabitants of the disaffected states in a state of insurrection as early as April 19, 1861, when he set on foot the blockade of certain ports, including those in Mississippi. Prize Cases, 2 Black [67 U. S.] 635, 670. In the opinion in those cases, Mr. Justice Grier, speaking for a majority of the court, says: "Whether the president, in fulfilling his duties, as commander in chief, in suppressing an insurrection, has met with such armed hostile resistance, and a civil war of such alarming proportions, as will compel him to accord to them the character of belligerents, is a question to be decided by him, and this court must be governed by the decisions and acts of the political department of the government to which this power was entrusted. He must determine what degree of force the crisis demands. The proclamation of blockade is itself official and conclusive evidence to the court that a state of war existed which demanded and authorized a recourse to such a measure, under the peculiar circumstances of the case." There had been no declaration of war. Congress alone can declare war; but the court held, in the same cases, that that body could not declare war against a state, or any number of states, by virtue of any clause in the constitution. It also held, that the president had no power to declare or initiate a war, either against a foreign nation or a domestic state. It distinctly decided, however, that the president could, and did, recognize a state of war as actually existing, and that the courts were bound to accept such recognition of the fact as conclusive. Of course, they must recognize the legal consequences which flow from the state of war. It would seem to follow, that, if the president has the power to recognize a state of war as an existing fact, and that this recognition is binding on the courts, he must equally have the power to rec-

ognize a state of peace as an existing fact, and that the courts are equally bound by such recognition. Especially would this seem to be the case in this civil war, where no formal treaty of peace could mark the line where war ended and peace commenced, and where there was no declaration of the legislature inconsistent with the proclamation of the executive.

But, whether this is the true doctrine or not, it must be remembered, that the act of congress of July 13, 1861, authorized the president to declare certain states in insurrection, whereupon all commercial intercourse was to become unlawful. On the 16th of August following, he issued such a proclamation. From that time forward, the interdiction of commercial intercourse had the double sanction of public law and a special act of congress, operating from the date of the proclamation. Now, it may be said with some force, that, inasmuch as commercial intercourse became unlawful under this act of congress, ipso facto, on the declaration of the president of the fact of insurrection, it must have continued unlawful until the insurrection was, by him or congress, declared ended; and that, therefore, he could not legalize free intercourse between the citizens of the two sections, without first declaring the rebellion suppressed. But this would be a very narrow and technical view to take of a great public question, relating to an anomalous condition of public affairs, and bearing upon interests of infinite diversity and great magnitude. The act of July 13, 1861, was, by its express terms, to be operative as an interdiction of intercourse, only through a proclamation of the president. Congress left it to his discretion to put the interdiction in force. I think, by fair implication, it left with him the power to withdraw it. There were reasons of the highest public import why this power should remain with him. The war had commenced during a recess of congress. It was necessary for the president to act promptly, and he called for troops, and set on foot a blockade, some time before congress could assemble. Hostilities might cease, and the war be substantially terminated, during a recess of congress, when prompt action by the president might be of the highest importance to our foreign and domestic commerce. This power of the executive to restore pacific intercourse seems to have been practically conceded, without dissent from any quarter. Neither congress, nor the executive, nor the people have acted upon the assumption that intercourse between the people of the two sections in private civil affairs has been unlawful since June 13, 1865. On the contrary, by the common consent of all departments of the government, such intercourse was substantially free and unrestrained after that date as well as after the 2d of April, 1866. Business began to seek its old channels, new contracts were made, old ones were litigated and enforced in the courts of both sections, and money was invested at the South in various enterprises. No doubt would ever have arisen as to the validity of

the president's proclamation removing all restrictions upon ordinary pacific intercourse between the people, but for the subsequent struggle between congress and the executive department as to the political status of the Southern states. But that controversy has no proper relation to the question now under consideration. Congress has never, even by implication, declared commercial and pacific intercourse of any kind unlawful since the president assumed to remove the restriction, on the 13th of June, 1865. On the contrary, its silence on this subject, when legislating on the purely political questions involved in what is called "reconstruction," supports the inference, that the ordinary civil pursuits of the people, and all the rights incident to them, including the right to free intercourse between the citizens of both sections, and the right to resort to legal civil remedies, were considered by congress itself as no longer under the ban of war. I am, therefore, satisfied, that the authority of the president to issue the proclamation of June 13, 1865, restoring free intercourse, was full and ample, and that its exercise has been acquiesced in by the national legislature.

We are next to consider what was the legal effect of that proclamation. Its language has already been cited. Beyond all question, it embraces all contracts thereafter to be made, and delivers them from the invalidating effect of public law, as well as from the effect of the statute of July 13, 1861, and the proclamation made in pursuance thereof, August 16th, following. Such contracts being valid, the right to enforce them in the courts necessarily followed. A citizen of one section could sue a citizen of the other on such a contract, without having his suit defeated on the ground that it was invalid, either by public or statute law, or abated under the plea of alien enemy. Both the right and the remedy on such a contract were complete.

The question then arises—in what condition were the numerous contracts, existing when the war commenced, left by the proclamation of June 13, 1865? Were they still suspended, and the parties without any right to enforce them? Undoubtedly, unpaid debts, contracted before the war, could have been lawfully paid by citizens of one section to those of the other, at any time after the date of that proclamation. This would be exercising one of the privileges of "domestic intercourse," restored in express terms by that proclamation. It would seem to follow, that the right to enforce payment through ordinary legal remedies must have been restored also. It would be absurd to contend that the proclamation removed the prohibition to enter into new contracts, and left those entered into before, and existing at, the commencement of the war, suspended. Such a distinction would be unjust as well as absurd. It would be a distinction between rights of the same class, and could rest upon no principle of natural justice, good sense, or sound policy. No such construction should be given to a state paper like this proclamation. It was

made in the interests of peace and its ordinary beneficent pursuits, and in furtherance of the rights of the people of both sections of a common country. No possible advantage in the way of convenience, interest, or security to the public or to individuals, consistent with justice, requires that its operation and legal effect should be thus contracted. It should, therefore, receive a liberal, rather than a narrow and technical, interpretation.

It follows, from these principles, that the contract upon which this suit is founded, though suspended during the war, while intercourse between the citizens of the belligerent sections was unlawful, revived on the 13th of June, 1865, and was from that date in full force. From that time there has been no legal obstacle to its enforcement. Whether Mississippi was without civil tribunals during any portion of the time since the contract revived, is not averred in the replication, nor was it proved on the trial. This court cannot have judicial knowledge on that point. But it is immaterial. The plaintiff could have resorted to the state tribunals of Connecticut, or to this court, at any time after his appointment as administrator. Not having brought his suit within the time limited by the policy, exclusive of the whole period of disability, the plea in bar is a conclusive answer to his right to recover. Judgment must, therefore, be entered for the defendants.

[This judgment was reversed by the supreme court, where it was carried by writ of error. 13 Wall. (80 U. S.) 158.]