————o————

DAN'L C. DEJARNETTE, *et al.*, Defendants in Error, *vs.*
ARMAND FRANCOIS ROBERT COMPTE DEGIVERVILLE, and
MARY VIRGINIA KINGSBURY, his wife, *et al.*, Plaintiffs in
Error.

1. *Bill in equity to set aside sale of land made during rebellion for non-payment
of note.*—During the late rebellion, citizens residing in the rebel states were
alien enemies and could not sue in courts of the loyal States, but they might
be sued therein by citizens of the latter States.  Thus, where, after the Presi-
dent's proclamation of August, 1861, a note having been dishonored, certain
land given under deed of trust to secure it was sold to satisfy the debt, a bill in
equity will not lie on behalf of the maker to set aside the sale, on the ground
that the plaintiff was, when the note matured and the land was sold, within
the Confederate lines and cut off from all intercourse with the loyal States : it
further appearing, that the plaintiff had voluntarily gone and remained South.
The doctrine of Dean vs. Nelson, (10 Wall., 158,) has no application to such a
case.

*Held* further, that the trustee having absolute power to sell on default, it was
immaterial what were the circumstances or disabilities of the maker of the
note.

Failure of notice to him, or even his previous death, would not invalidate the sale. The notice required by statute was not intended to apprise the grantor in the deed, of the sale of the land.

PER NAPTON, J., DISSENTING.

2. *Note—Deed of trust—Sale under during war—Equity will interpose.*—During the late war, the citizens of the rebel States being alien enemies were subject to the laws of nations, under which one residing in the South would be prohibited from paying a note which fell due in the loyal States during that period. Hence, default in its payment under such circumstances would not authorize the sale of land given under deed of trust to secure it, and equity would interpose to set aside the sale.

The note and deed of trust must be construed as made subject to the implied power of the governments to which the parties belong, to interfere with or suspend it "*flagrante bello.*"

### Appeal from St. Louis Circuit Court.

*Thos. T. Gantt*, for Plaintiff in Error relied upon Washington University vs. Finch, Cent. Law Journ., No. 6, 1874.

*Trusten Polk*, for Defendants in Error.

I. The last of the notes fell due while the war was raging and could not have been paid; and under that state of facts, the law would not allow it to be paid or the holders to receive payment. There was, therefore, no default on the part of the plaintiffs.

It follows, that there was not the presence of the condition upon which the trustee had assumed the obligation to sell the land, and of course he could make no valid sale. The making of the sale was a violation of his duty. Such inability to pay did not exist in the case of Dean vs. Nelson.

In consequence of the war, the plaintiffs being restrained and cut off from all communication with the defendants and the State of Missouri, it was not only a legal, but a physical, impossibility for them to pay the note.

*J. E. Drake*, for Defendants in Error.

The late war was a public war, not only between the governments, but between their individual citizens, and hence all commercial or business intercourse between persons domiciled in those sections was unlawful. (The Venice, 2 Wall., 258;

Mrs. Alexander's Cotton, *Id.*, 404; Mauran vs. Ins. Co., 6 Wall., 1, and cases therein cited; Ouchita Cotton, *Id.*, 521; Hanger vs. Abbott, *Id.*, 532; Coppell vs. Hall, 7 Wall., 542; KcKee vs. U. S., 8 Wall., 163; U. S. vs. Grossmayer, 9 Wall, 72; Bigler vs. Waller, 3 Am. Law Times, 157; McKee vs. Watson, 6 Am. Law Reg. [N. S.], 220; Jackson Ins. Co. vs. Stewart, 6 Am. Law Reg. [N. S.], 732; Cuyler vs. Ferrill, 8 *Id.*, 100; Semmes vs. City Fire Ins. Co., 8 *Id.*, 673; Kanawha Coal Co. vs. Kanawha & Ohio Coal Co., C. C., U. S., South. Dist. of N. Y., June 24, 1870, and cases cited; Dean vs. Nelson, 10 Wall., 158.)

I. From the nature of the case, plaintiff could have no valid notice. A notice to the mortgagor by publication in a newspaper was not legal, and, in a case like the present, proceedings founded thereon were wholly void. *A fortiori*, this is true in case of a deed of trust, being extra-judicial.

II. It appears from the agreed statement, that the plaintiffs for a long time prior to, during and subsequent to the publishing of said notice, &c., and during the continuance of the late war, were citizens and residents of Virginia, and under the control of the Southern Confederacy.

Even granting that they voluntarily placed themselves in this condition, and went within the Confederate lines, their *status* in this court is not changed or impaired thereby. The court will not enquire into the personal character or dispositions of the parties herein. (Mrs. Alexander's Cotton, 2 Wall., 404; Com. Ins. Co. vs. Hall, 7 Am. Law Reg., [N. S.] 606; Dean vs. Nelson, 10 Wall., 158.)

As to whether the petition makes a case for equitable relief, the facts there stated speak for themselves. Plaintiffs come into the court with clean hands, having made every offer and used all diligence that could be required of them; and surely a case of such hardship, wrong and injustice rarely occurs in the annals of the law. The case of the Kanawha Coal Co vs. The Kanawha & Ohio Coal Company is unanswerable authority in the case at bar.

WAGNER, Judge, delivered the opinion of the court.

In this case, the petition sets out a purchase by the plaintiffs from the defendants, in the year 1857, of certain real estate in the city of St. Louis, and the giving of notes for the consideration, secured by deed of trust, payable in one, two, three and four years, the last becoming payable on the 30th of April, 1861; a failure to pay the last note, and a sale by the trustee in consequence on the 9th of June, 1861, after publication of notice as required by the deed of trust. It was alleged, that all the notes were paid except that which matured on the 30th of April, 1861, and that the plaintiffs were ready and willing to pay this also, but were prevented by a state of war existing at that time, between the United States of America, of which Missouri was a part, and the Confederate States, of which Virginia was a part; and that the plaintiffs were, in 1857 and in 1861, and during the whole of the war which followed, citizens and residents of the county of Caroline, Va. By reason of the war existing, it was alleged, the notice and sale under the deed of trust were fraudulent and void. It was averred, that as soon as peace was restored, the plaintiffs tendered to the purchaser of the land the amount due under the deed of trust, which was refused, and they prayed that the deed made by the trustees under the sale of June 9, 1861 be set aside and annulled. To this petition the defendants demurred, assigning for causes of demurrer, that the petition showed no cause of action; that it appeared that at the time the default was made there was no suspension of intercourse between the citizens of Virginia and those of Missouri, and that even when the sale was made under the deed of trust, there was no such suspension, and that there was no excuse for the non-payment of the note of the plaintiffs. The court below overruled the demurrer and gave judgment for the plaintiffs, and the case is brought up for review on writ of error.

Whether there was any real or actual suspension of the relations theretofore existing prior to the act of Congress of July 12, 1861, empowering the President to prohibit, by pro-

clamation, all commercial intercourse between the rebellious and the loyal States, and the proclamation of the President in pursuance thereof, issued August 16, 1861, I will not stop to inquire. The case has been argued here upon the theory that, at the time the sale took place, Virginia had passed her ordinance of secession, and was out of the Union, and was among the number waging war against the general government. If so, her citizens were entitled to belligerent rights, and were clothed with all the characteristics of alien enemies.

Since the decisions in the Supreme Court of the United States in the cases of the Venice, (2 Wall., 258 ;) Mrs. Alexander's Cotton, (2 Wall., 404 ;) Mauran vs. Insurance Company, (6 Wall., 1 ;) Ouachita cotton, (6 Wall., 521); Hanger vs.Abbott, (6 Wall. , 532 ;) Coppell vs. Hall, (7 Wall., 542 ;) McKee vs. United States, (8 Wall., 163 ;) United States vs. Grossmayer, (9 Wall., 72 ;) the question must be regarded as settled, that the late war between the Confederate States and the United States was a public war ; and a war, not only between the respective governments, but between all the inhabitants of the one territory, on the one side, and all the inhabitants of the other territory on the other side, so that all the people of each occupied the respective positions of enemies during the continuance of the war.

The consequence of a state of war is the interruption and interdiction of all commercial intercourse, correspondence and dealing between the subjects of the hostile countries. Kent says the interdiction flows necessarily from the principle that a state of war puts all the members of the two nations, respectively, in hostility to each other, and to suffer individuals to carry on a friendly and commercial intercourse while the two governments were at war, would be placing the act of government, and the acts of individuals in contradiction to each other. (1 Kent's Com. 66.)

As a corollary of this doctrine the principle is well established that an alien enemy cannot sue a friendly citizen in the courts of the latter's country. (Bac. Abr. Alien, D. ; Alcinous vs. Nigreu, 4 El. and Bl., 217 ; DeWahl vs. Braune, 1

H. & N., 178; Whelan vs. Cook, 29 Md., 1; U. S. vs. 1756 Shares of Stock, 5 Blatch, 231.) His disability is temporary in its nature, and personal, and founded upon reason and policy, and in a great measure upon necessity. But no such reason or policy forbids judicial proceedings against an alien enemy in favor of a friendly citizen, and the rule is therefore settled that while an alien enemy may not sue, he may be sued at law.

The question has frequently been brought up in our courts in regard to matters arising out of the late rebellion, and the adjudications in the courts of last resort have all been in accordance with the principles above announced.

In Mixer vs. Sibley, (53 Ill., 61,) it was decided that when a party residing in the State of Illinois, holding a promissory note against a person residing in one of the States in rebellion, in the year 1862, after the act of Congress, and the President's proclamation prohibiting commercial intercourse between the adhering States and those in rebellion, commenced a suit thereon by attachment, which was levied on real estate situated in that State belonging to the maker, and obtained a judgment, and procured a sale to be made of the premises attached, that the court had jurisdiction of the cause, and the judgment and proceedings thereunder were valid and binding, notwithstanding the defendant resided in one of the rebellious States, and the war at the time was in active progress.

In the case of Dorsey vs. Kyle, (30 Md., 512,) the court holds that a person who, by his own voluntary act, assumed the attitude of an alien enemy to his State, and to the government of the United States, going from Maryland to Virginia during the late civil war, allying himself with the southern cause and joining the confederate army, cannot claim exemption from process of attachment in behalf of antecedent creditors against his property remaining in the State, on the ground that he was an alien enemy, and that all legal remedies were suspended during the period of hostilities. It is emphatically declared that neither reason nor policy forbids judicial proceedings against an alien enemy in favor of a

friendly citizen, and therefore while an alien enemy may not sue he may be sued at law. The same question again arose in Dorsey vs. Dorsey, Id., 522, and the same principle was again asserted and re-affirmed.

The same conclusion was arrived at in the case of Thomas vs. Mahone, in the court of appeals of Kentucky, (12 Am. Law Reg., N. S., 433.) There the civil code of Kentucky authorized the creditors of a citizen who departed from the county of his residence and remained absent thirty days within the confederate lines, to attach his property and sell the same for the payment of their debts. The plaintiff left his home and joined the confederate service, and while so absent attachments were procured and his property sold, and the court held that the fact that the debtor was a soldier in the confederate army would not deprive the court of jurisdiction under the code. Lindsay, J., in delivering the opinion of the court, pointedly remarks: "It does not follow, because appellant was at the time a soldier in the army of the belligerent power, and that all unlicensed communication with him by the people of the States adhering to the federal Union was inhibited, not only by the laws of war, but by express statute, that resident creditors might not sue him in the courts of this State, and subject to the judgment of their debts such of his property as might be found within the local jurisdiction of the courts in which he was sued. The right of resident creditors so to proceed against parties indebted to them, residing within the lines of the hostile power, and held to be public enemies by reason of their participation in the southern movement, was recognized by the federal congress in the act of March 3, 1863, (2 Brightley's Digest 1238,) providing for the seizure and confiscation of the property of such persons."

In Crutcher vs. Hord and wife, (4 Bush., 363,) the same court held that a proceeding by a Kentucky creditor to enforce his lien on land situated in that State was not interdicted, notwithstanding the existence of the war and the residence of the debtors within the confederate lines. The Su-

preme Court of the United States in the case of McVeigh vs. the United States, (11 Wall., 259 ;) after citing Albretcht vs. Sussmann, (2 Ves. and Bea., 324; Bacon's Abridgment and Story's Equity Pl., § 53,) for authority says: "Whatever may be the extent of the disability of an alien enemy to sue in the courts of the hostile country, it is clear that he is liable to be sued."

It is contended that the case of Dean vs. Nelson, (10 Wall., 158,) asserts a contrary doctrine. That case was a proceeding within an insurrectionary district, but held by the national military forces, in a court established by military orders alone. It was a proceeding to foreclose a mortgage on personal property, and it was instituted against parties who had been expelled by military force from their residence, and who were forbidden absolutely by the order which expelled them from coming back again within the lines of the militaty authority which organized the court. They were not voluntarily within the confederate lines, but were sent there against their will, and inasmuch as without their consent and against their will they were thus driven from their homes and forbidden to return by the arbitrary act of the military power, it was held that a judicial decree by which their property was sold during the continuance in force of this order was void as to them.

But in the subsequent case of Ludlow vs. Ramsey, (11 Wall., 581,) it was adjudged that the doctrine of Dean vs. Nelson, that a judicial proceeding on a mortgage carried on within the Union lines against a person driven, by way of retaliation for outrages committed by others, outside of those lines, and prohibited from returning within them, did not apply to a person who went and remained voluntarily in rebellion. Such a person could not complain of legal proceedings regularly prosecuted against him as an absentee.

But there is another aspect in which this case must be considered, and which really presents the principal point, and upon which I would have been satisfied to have placed it had not the counsel for the defendants in error, plaintiffs in the court below, insisted in their briefs that the war produced an en-

tire suspension of all proceedings whatever between the citi-zens of the respective sides and avoided all judicial process. The sale was made under a deed of trust containing an agreement that in default of payment when the notes matured, the trustee, upon giving the requisite notice, should proceed to sell the property to satisfy the debt. It contained a power coupled with an interest which was irrevocable in its charac-ter, and when the contingency arose calling forth its execu-tion, the trustee was authorized to execute it regardless of the status of the grantors at the particular time. So far as the authority of the trustee was concerned to go on and make a sale of the property in satisfaction of the debt, it made no difference whether the grantors were in the Confederate lines or in the jungles of India, or even if they were dead. It may be conceded that they were in a place or in a condition where it was physically impossible for notice to reach them, but that would not alter the case, as the notice was not designed to be given for their benefit in the sense of notice to them. It was intended to notify the community that the sale would take place in order that bidders might be present to purchase the property.

In the case of Beatie vs. Butler (21 Mo., 313), it appears that Beatie borrowed a certain sum of money, and, to secure its payment, he executed a mortgage, on real estate, contain-ing a power of sale. Before the note was paid off Beatie died, and after his death the mortgagee sold the property. Neither the widow nor children of Beatie were notified of the sale. Afterwards they moved to set aside the sale, but the court de-nied the motion, holding that the death of the mortgagor did not extinguish or suspend the power of sale in the mortgage. Scott, J., in writing the opinion of the court, says: "The argument that the death of Beatie should have suspended all proceedings under the mortgage, in analogy to the suspen-sion of all process of execution under the administration law against the estate of defendants, cannot be maintained. The law may suspend its own process. As it gives the process, it may regulate it. But deeds of trust and mortgages with a

power of sale, arise from the consent and agreement of parties, and there is no propriety in depriving creditors of the fruits of their foresight and caution. The statute of the 25th of January, 1847, is an answer to the argument. That statute, notwithstanding the death of the grantor, in a deed of trust, recognizes a right of sale in the trustee, though it is postponed for nine months after the death of the maker of the deed.

The precise question now under consideration arose in Harper vs. Ely (56 Ill., 179), where the court decided that the remedy of the holder of a mortgage in that State to make sale of the mortgaged premises in case of default, under a power in the mortgage, was in no wise impaired or suspended during the existence of hostilities in the late war of the rebellion, on account of the residence of the mortgagor and his grantee, subsequent to the mortgage, within the rebellious states; and that the rule applied as well to the grantee of the mortgagor, who always resided within one of the States, which, after conveyance to him, joined in the rebellion, as to the mortgagor himself, who, after making the mortgage, left his residence in one of loyal States for the purpose of engaging in hostilities against the government.

The very recent decision of the supreme court of the United States, in Washington University vs. Finch, reported in the Central Law Journal No. 6, 1874, is in point. In that case the facts are that Daly and Chambers purchased of W. G. Eliot in March, 1860, certain real estate in the city of St. Louis, and gave a deed of trust to secure the purchase money. In this deed Ranlett was trustee. The purchasers were citizens and residents of Virginia. Ranlett, as trustee, advertised and sold the premises in December, 1862, after the establishment of non-intercourse between the government and Confederate States. The United States Circuit Court declared the sale to be unlawful because of this non-intercourse, and set aside the deed made by the trustee. The Supreme Court unanimously reversed the judgment, and directed the Circuit Court to dismiss the bill. Mr. Justice Miller, who wrote the opinion, in commenting upon Dean vs. Nelson, *supra*, said

29—VOL. LVI.

that the court had "never decided nor intentionally given expression to the idea that the property of citizens of the rebel States, located in the loyal States, was, by the mere existence of the war, exempt from judicial process for debts due to citizens in the loyal States contracted before the war." Upon the merits of the immediate case under consideration, the learned judge remarked: "The debt was due and unpaid. The obligation which the trustee had assumed on a condition had become absolute by the presence of that condition. If the complainants had been dead, the sale would not have been void, for that reason, if made after the nine months during which a statute of Missouri suspends the right to sell in such cases. If they had been in Japan, it would have been no legal reason for delay. The power under which the sale was made was irrevocable. The creditor had both a legal and a moral right to have the power, made for his benefit, executed. The enforced absence of the complainants, if it be conceded that it was enforced, does not, in our judgment, afford a sufficient reason for arresting his agent and the agent of the creditor in performing a duty which both of them imposed on him before the war began. * * * The interest of the complainants in the land might have been liable to confiscation by the government; yet we are told that this right of the creditor could not be enforced, nor the power of the trustee lawfully exercised. No authority in this country, or any other, is shown us for this proposition. It rests upon inference from the general doctrine of absolute non-intercourse between citizens of States which are in a state of public war with each other, but no case has been cited of this kind even in such a war.

It is said that the power to sell in the deed of trust required a notice of the sale in a newspaper; that this notice was intended to apprise the complainants of the time and place of sale, and that, as it was impossible for such notice to reach the complainants, no sale could be made. If this reasoning were sound, the grantors in such a deed, need only go to a place where the newspapers could not reach them, to delay the sale

indefinitely, or defeat it altogether. But the notice is not for the benefit of the grantor in the sense of notice to him. It is only for his benefit, by giving notoriety and publicity of the time, terms and place of sale, and of the property to be sold, that bidders may be invited, competition encouraged, and a fair price obtained for the property. As to the grantor, he is presumed to know that he is in default, and his property liable to sale at any time, and no notice to him is required. * * * We are of the opinion that the sale by the trustee in the case under consideration, was a lawful and valid sale, and that complainants' bill should have been dismissed."

This argument, it seems to me, is unanswerable, and is so remarkably clear and satisfactory, that nothing remains to be added. The judgment should be reversed, and the petition dismissed. Judges Vories and Sherwood concur; judges Napton and Adams dissent.

NAPTON, Judge, delivered the dissenting opinion of the court.

As the decision of the majority of the court, in this case, involves a question of considerable importance, and has been, unfortunately, so differently viewed by the most respectable judicial tribunals in this country, it is proper that the dissenting judges should state the grounds upon which their dissent is based.

To understand the point involved, it is necessary to state the facts on which the question of law in this case arises, and as it was raised by a demurrer to the petition, the facts stated in the petition are of course admitted.

These facts are, briefly, that the plaintiffs are citizens of Virginia, and had been from the inception of the contract out of which the controversy arose, which was long prior to the war of 1861—that they continued to be citizens of Virginia during the war, and were still such citizens, domiciled in that State, when this proceeding was instituted. They purchased some land in this county (St. Louis) in 1857, for which they paid one-fifth of the purchase money in cash, and for the re-

maining four-fifths, executed four notes, respectively payable in one, two, three and four years from date, which date was the 27th of April, 1857. · They received a deed for this land, and to secure the purchase money not paid, executed a mortgage or deed of trust, which authorized the trustees to to sell the same if any of the notes should not be paid, upon a notice of such sale specified in the deed. All the notes were paid, except the last one, which fell due on the 30th of April, 1861. This last payment not having been made, the trustees advertised in 1862, and sold the land in conformity to the provisions of the trust deed.

The petition asserts that, on the 12th of April, 1861, and from that time forward, to the time of the sale, a war was existing between the Confederate States, of which Virginia was one, and the United States, to which Missouri adhered, and that the plaintiffs were citizens of the former, and subject to their laws. They aver that when the note fell due, on the 30th of April, they were ready and willing to pay the same, but were prevented from so doing by said war, and by their continued allegiance to the State of Virginia and to the Confederate government, of which Virginia was a part; that they had no notice of the advertisement, or sale thereunder, and therefore, ask to redeem.

. To this petition there was a demurrer, which was overruled by the Circuit Court, and judgment for plaintiffs rendered thereon. But on appeal to this court, this demurrer is sustained, and the plaintiffs thereby declared to have no ground for redemption.

It will be seen from this statement, that this is not a case of a mortgagor who has died after or before forfeiture, or of a mortgagor who has gone to Japan, or some other inaccessible place, where notices could not be served on him, or of a mortgagor who has left his domicile for any purpose, or of a mortgagor who has gone from the United States to risk his fortunes with the Confederate States, or one who has been expelled from the states supposed to be loyal to the federal government, on account of suspicions of his disloyalty.

It is the case of a mortgagor who continues to live where he always has lived, so far as the record shows, and where, for aught that appears, he was born. I shall therefore, decline to give any opinion on the cases hypothetically stated—but will confine my opinion to the facts upon which the Circuit Court passed.

.The question is very simple : whether a mortgage, or deed of trust, executed by a citizen of Virginia in 1857, to a citizen of Missouri, which requires the payment of a sum of money on the 30th of April, 1861, is forfeited by a failure to pay the money on that day, and whether the trustee or mortgagee may sell the mortgaged premises, for such failure of payment, occurring after the beginning of war between the countries where the parties are respectively domiciled.

That the war between the United States and the Confederate States attained the dignity of a civil war, and made both parties to it occupy the position of belligerent sovereignties, has so often been conceded in the decisions of the highest judicial tribunals of the United States, constituting the judicial department of the government that succeeded, and by the cases cited in the opinion of the majority of this court, that I might be excused from repeating the citations. But I prefer to recall the language of the courts in those cases, as explanatory of their position.

In Brown vs. Hiatts, (15 Wall., 177) Mr. Justice Field says : "It is unnecessary to go at length over the grounds upon which this court has repeatedly held that the statutes of limitations of the several states did not run against the right of action of parties during the continuance of the civil war. It is sufficient to state that the war was accompanied by the general incidents of a war between independent nations ; that the inhabitants of the Confederate States, on the one hand, and of the loyal States on the other, became thereby reciprocally enemies to each other, and were liable to be so treated, without reference to their individual dispositions or opinions ; that during its continuance, all commercial intercourse and correspondence between them were interdicted

by principles of public law, as well as by express enactments of congress; that all contracts previously made between them were suspended, and that the courts of each belligerent were closed to the citizens of the other."

It may not be inappropriate to quote further from this opinion—which proceeds thus: "As the enforcement of contracts between enemies, made before the war, is suspended during the war, the running of interest·thereon, during such suspension, ceases. Interest is the compensation allowed by law, or fixed by the parties, for the use or forbearance of money, or as damages for its detention, and it would be manifestly unjust to exact such compensation or damages, when the payment of the principal debt was interdicted."

As this case declares the war of 1861 to have been accompanied with the same consequences as followed a war between independent sovereignties, we may with propriety recur to a decision of the Supreme Court of Pennsylvania, in regard to the effect of another war, originating in a rebellion—and a successful one—and which was placed on the same footing with the one to which Mr. Justice Field referred.

In Hoare vs. Allen, decided by the Supreme Court of Pennsylvania, in 1789, (2 Dal., 102) the court say: "This action is brought on a mortgage for £16,000, payable on 4th Dec., 1774. No suit could be brought on the mortgage before the 4th Dec. 1775. Before that period the war commenced, and on the 10th September, 1775, the congress prohibited the exportation of commodities, etc., to Great Britain, or any of her dominions. This was obligatory on their constituents, and it became unlawful to make any remittances after this, to the enemy. During a war, all civil actions between enemies are suspended; debts are suspended also, but restored by the peace. For the term of seven and a half years, viz: from 10th September, 1775, to 10th March, 1783, the defendant could not have paid this money to the plaintiff, who was an alien enemy, without a violation of the positive laws of this country, and of the laws of nations. They ought not, therefore, to suffer for their moral conduct and their submission to the laws."

. That case is evidently exactly like the present, except that it related to a successful rebellion against Great Britain, on which our independent national existence is based, and may, on this account, be repudiated as inapplicable to the recent war in which rebellion was unsuccessful. It was the case of a mortgage given by a citizen of Pennsylvania to a subject of Great Britain, and the court declare that since all intercourse with Great Britain, when the mortgage money fell due, was prohibited by the congress of the United States and by the laws of nations, the failure to pay to the alien enemy did not and ought not to produce a forfeiture of the mortgage, or an exaction of damages in the shape of interest for the non-payment of the principal, at a time when the law prohibited its payment. I am unable to distinguish it, in principle, from this case, and it was decided by a court which historically occupies a very high place in American annals, and the opinion was delivered by Ch. J. McKean, associated with judges Shippen, Yeats and Bradford, a court whose bar contained such names as Sergeant, Ingersoll, Duponceau, Lewis, Rawle, Dallas and Tilghman. And, from a note appended by Mr. Dallas, the reporter (himself not unknown in our judicial and political annals), it appears that Mr. Jefferson, when Secretary of State, in his reply to Mr. Hammond, the British minister plenipotentiary, had maintained the same doctrine with the Pennsylvania court, concurring as it did with that subsequently maintained by the Supreme Court of the United States, as announced by Mr. Justice Field. And, although Mr. Jefferson is chiefly known as a great statesman, he was also a lawyer by profession, and a very learned one, and he maintained the same doctrine enunciated by the Supreme Court of Pennsylvania, and referred to English authorities in support of it, and to the adjudications of New York, Maryland and Connecticut, though he admitted that if the creditor had an agent in this country during the war, to whom the money could be paid, the result might be different. (2 Dall., 104.)

We may quote further from the opinion of the court in that case: "Interest is paid for the use or forbearance of money.

But in the case before us, there could be no forbearance; be. cause the plaintiff could not enforce the payment of the principal; nor could the defendants pay him, consistently with law; nor could they pay it without going into the enemy's country, where the plaintiff was. Where a person is prevented by law from paying the principal, he shall not be compelled to pay interest during the prohibition, as in the case of a garnishee in a foreign attachment."

And the court says further:

"It is urged, that a remittance of bills of exchange furnished the enemy with no money, yet it is clear that it would furnish the enemy with the means of carrying on the war within the bowels of the country without bringing any money into it."

And in conclusion, Chief Justice McKean says:

"I have searched for precedents, both in the civil law and in the books of reports; but could find none. We, therefore, determine on principle and analogy, and are unanimously of opinion, that the plaintiff is not entitled to interest from the 10th September, 1775, to 10th March, 1783." This was the decision of a court composed of judges eminent for ability and learning, and made just after the close of our revolutionary war with Great Britain. And the same doctrine is maintained by the Supreme Court of the United States during the second war with Great Britain, and is thus stated by Judge Story in the case of the Julia (8 Cranch, 18): "I lay it down as a fundamental proposition, that, strictly speaking, in war all intercourse between the subjects and citizens of the belligerent countries is illegal, unless sanctioned by the authority of the government, or in the exercise of the rights of humanity. I am aware that the proposition is usually laid down in more restricted terms by elementary writers, and is confined to commercial intercourse." (Bynkershook and Valin are then quoted.) And this eminent judge then proceeds to say: "From this last expression it seems that Valin did not understand the interdiction as limited to mere commercial intercourse."

In the elaborate judgment of Sir W. Scott in the Hoop (1 Rob A. & M., 196), the illegality of commercial intercourse is fully established as a doctrine of national law ; but it does not appear that the case before him required a more extended examination of the subject. The black book of the admiralty contains an article which deems every intercourse with the public enemy an indictable offense.  *  *  " But, independent of all authority, it would seem a necessary result of a state of war to suspend all negotiations and intercourse between the subjects of the belligerent nations. By the war, every subject is placed in hostility to the adverse party. He is bound by every effort of his own to assist his own government and to counteract the measures of its enemy. Every aid, therefore, by personal communication, or by other intercourse, which shall take off the pressure of the war or foster the resources, or increase the comforts of the public enemy, is strictly inhibited. No contract is considered as valid between enemies, at least so far as to give them a remedy in the courts of either government, and they have, in the language of the civil law, no ability to sustain a *persona standi in judicio*."

The same doctrine is reiterated by Mr. Justice Johnson in the case of the Rapid, 8 Cranch, 155: "As to the nature and consequences of a state of war, there was really (he said) no difference of opinion among jurists. In the state of war, nation is known to nation only by their armed exterior, each threatening the other with conquest or annihilation. The individuals who compose the belligerent States exist as to each other in a state of utter seclusion. If they meet, it is only to combat. The universal sense of nations has acknowledged the demoralizing effects that would result from the admission of individual intercourse. The whole nation are embarked on one common bottom and must be reconciled to submit to one common fate. Every individual of the one nation must acknowledge every individual of the other nation as his own enemy, because the enemy of his country."

And the learned and eminent chancellor who reviewed this subject in Griswold vs. Waddington (16 Johns. 482,) says : "I

think I may venture to hazard the assertion, without any imputation, after the examination which has been given to the subject, that there is no authority in law, whether that law be national, maritime or municipal, for any kind of private, voluntary, unlicensed business,⸱communication or intercourse with an enemy. It is all noxious, and in a greater or less degree, it is all criminal. Every attempt at drawing distinctions has failed—all kind of intercourse except that which is hostile, and created by the mere exigency of war and necessity of the case is illegal. The law has put the sting of disability into every kind of voluntary communication and contract with an enemy, which is made without the special permission of the govern⸱ment. There is wisdom and policy, patriotism and safety in the principle, and every relaxation of it tends to corrupt the allegiance of the subject and prolong the calamities of war. The idea that any remission of money may be lawfully made to an enemy is repugnant to the very rights of war," etc.

And it may be noted, that Chancellor Kent, in his elaborate opinion in this case, expressly holds, that " a formal declaration of war is not necessary by the usages of Europe, and war may begin by mutual hostilities as well as by a declaration. * * In the war which occurred between England and France in 1778, the first public act on the part of the English government was the withdrawing of its minister from France, and that single act was declared by France to be the first breach of the peace. There was no other declaration of war."

These principles are, however, fully recognized by the present Supreme Court of the United States and applied to the war between the Confederate States and the United States.

In the United States vs. Grossmayer (9 Wall., 75), Mr. Justice Davis says: "A prohibition of all intercourse with an enemy during the war affects debtors and creditors on either side equally with those who do not bear that relation to each other. We are not disposed to deny the doctrine, that a resident in the territory of one of the belligerents may have, in the time of war, an agent residing in the territory of the other, to whom the debtor could pay his debt in money or deliver to

him property in discharge of it; but in such case, the agency must have been created before the war began, for there is no power to appoint an agent for any purpose after hostilities have actually commenced."

In Coppell vs. Hall (7 Wall., 557), Mr. Justice Swayne says: "The payment of money by a subject of one of the belligerents in the country of another is condemned, and all contracts and securities looking to that end are illegal and void." And the cases of Brown vs. United States, and the Rapid and the Julia, and the case of Griswold vs. Waddington, are referred to and sanctioned. Upon these authorities, it may be assumed, that the mortgagor domiciled in Virginia could not on the 30th of April, 1861, pay his note due on that day.

Mr. Chief Justice Chase, in the case of Bigler vs. Waller, said: "The actual beginning of the war against the United States, doubtless preceded the proclamation of the President of the 15th of April, 1861, calling out the militia to suppress insurrection; but the proclamation declaring a blockade of the ports of the insurgent States must be regarded as the first formal recognition of the existence of a civil war by the national government. That proclamation was issued on the 19th of April, and that date, therefore, must be taken as the date of the commencement of the war."

And the facts show (See U. S. Stat. at Large, Vol. 12, p. 1258), that the first proclamation of President Lincoln is dated the 15th of April, and the second on the 19th, and the third on the 27th. Without, therefore, resorting to the opinion of Chancellor Kent, that actual hostilities indicate a war more loudly than proclamations, we may safely conclude, that on the 30th April, 1861, when the last note on this purchase became due, there was an existing war between the Confederate States and the United States, and that Virginia was one of the Confederate States.

The question is, then, whether Mr. DeJarnette could have paid this note on the 30th of April, 1861; and this question is answered by all the cases I have cited in one way. The mortgagor had no right or power to pay the note, and the mort-

gagee had no right to receive it. And the only remaining question is, whether the non-payment of the note, which fell due on the 30th of April, 1861, which the law of nations prohibited the plaintiffs from paying, would authorize a sale and effect a forfeiture of the mortgagor's rights. The majority of this court have decided that it would, but I cannot concur in this decision either on principle or authority. On principle, I would have great difficulty in apprehending a proposition which would involve the necessity of conceding a forfeiture of right by any one who observed the law of the country in which he was domiciled. I cannot distinguish between the successful and the unsuccessful party.

On authority, I refer to the case of Dean vs. Nelson, (10 Wall., 158.) In that case, Mr. Justice Bradley, in delivering the opinion of the court, says : "the great question in the cause is whether the equity of redemption has been extinguished."

In considering that question he does not place the decision on any deficiency of power in the court which foreclosed the mortgage; for that court, though established under the protection of the United States army, was a tribunal for the adjudication of civil cases exclusively, and had no military authority whatever; but he says, "the defendants in the proceeding were within the confederate lines at the time, and it was unlawful for them to cross these lines. Two of them had been expelled from the Union lines by military authority, and were not permitted to return. The other, Benjamin May, had never left the confederate lines. A notice directed to them and published in a newspaper was a mere idle form. They could not lawfully see or obey it. As to them the proceedings were wholly void and inoperative."

And he concludes thus: "This leaves the equity of redemption in the mortgaged property unextinguished, and it is therefore the right of the appellees to redeem it."

It will be observed that the decision in this case of Dean vs. Nelson, goes further than it would be necessary on the facts of the present case to hold, in order to sustain the plaintiff's petition. In that case it appears that one of the debtors

was within the federal lines, when the money became due, and might have paid it; whereas, in the present case, when the note became due for which the trustee sold, the debtors were in Virginia, subject to the confederate government, and were prohibited from paying by the laws of the country. But the court in Dean vs. Nelson, held the whole proceeding to foreclose a nullity, because the notice required in the mortgage could not be given so as to impart any information to the mortgagors within the confederate lines, and although one of the debtors was within the federal lines, when the obligation matured, and might have paid it, yet as the proceeding to foreclose was commenced and carried on after the expulsion of the debtors into the confederate lines and where no notice of such proceedings could possibly reach them, the right to redeem was maintained and allowed.

This judgment in Dean vs. Nelson was, in my judgment, in conformity to the law of nations, which has been defined as "*id quod naturalis ratio inter omnes homines constituit,*" and emanating as it did from the highest branch of the judicial department of this government, conceding to the defeated party in the war the same rights in courts of justice that would of course be accorded to those who had the merit of "loyalty," I am not disposed to abandon it, and I believe that the Supreme Court of the United States have recently reaffirmed this decision in Lasere vs. Rochercau, (17 Wallace, 437).

I can never assent to the proposition that a compliance with and submission to the law will produce a forfeiture. All contracts are made subject to the implied power of the government to which the parties belong, to interfere with them, and to suspend them, and perhaps annul them in time of war. No default can arise from a compliance with the law.

This opinion of the Supreme Court of the United States was followed by the Supreme Court of the District of Columbia in the case of Green vs. Alexander, and by the Circuit Court of the United States for the southern district of New York, in the case of the Kanawha Coal Company vs. The

Kanawha & Ohio Coal Company, and by the learned judge of this circuit (Mr. Justice Dillon,) and the same principles are maintained in the learned opinion of the Circuit Court of the United States for the western district of Tennessee, in Tait and others vs. The New York Life Insurance Company: In the case of Semmes vs. City Fire Insurance Company, reported in 36 Conn. 543, in an appendix, the district judge, Shipman, made the same decision, which is reported at length, and is, in my opinion, in accordance with the law and the authorities. This decision was made in 1869, and I quote from it as coming from a tribunal in a State having no sympathy with the southern confederacy, but still willing to adhere to the positions where the *jus gentium* would lead. Judge Shipman says the replication sets up the late rebellion and alleges that a state of war existed between the organization known as the Confederate States, including the State of Mississippi, and the United States, from the 15th of April, 1861, to the 2nd of April, 1866, whereby it is claimed that this contract and all right to sue upon it was during all that time suspended. There is no allegation that the courts of Mississippi or the national courts in that State were closed for any specific length of time, nor that the plaintiff or his intestate labored under any personal disability arising out of his actual participation in the war, nor that he was under the control of any *vis major*, beyond what the law implies from the state of war. The whole question therefore turns upon the legal consequences of the war in their operation on this contract, and the length of time these consequences continued.

"It is of course conceded that a state of war, recognized as such by and between the belligerent parties, suspends all contracts in existence between the citizens of the respective belligerents at the time the war commences. The authorities are uniform on this subject. The general rule is well stated by Mr. Justice Nelson in Prize Cases, 2 Black., 687. The legal consequences resulting from a state of war between two countries at this day are well understood, and will be found described in every approved work on the subject of international

law. The people of the two countries become immediately the enemies of each other; all intercourse, commercial or otherwise, between them is unlawful ; all contracts existing at the commencement of the war suspended, and all made during its existence utterly void."

" This doctrine has been repeatedly recognized and applied to our late civil war by the courts of this country, both State and National."

"It is equally well settled that, upon the termination of the war, obligations contracted before its commencement between the respective subjects, though the remedy for their recovery is suspended during the war, are revived."

" In Hanger vs. Abbott, and Jackson Insurance Company vs. Stewart, this doctrine was applied to the statutes of limitation. In the former case Mr. Justice Clifford, speaking for the court says : "When a debt has not been confiscated, the rule undoubtedly is that the right to sue revives on the restoration of peace." And Mr. Chitty says, that, with the return of peace we return to the creditor the right and the remedy ; unless we return the remedy with the right, the pretense of restoring the latter is a mockery, as the power to exercise it with effect is gone by lapse of time, during which both the right and the remedy were suspended. "

"Applying this doctrine to the present case, it follows that the war in which the people of Mississippi on one side, and those of Connecticut on the other, participated, suspended the contract with all its incidents, including the condition set up in bar of this action and all rights of action under it."

" In view of the result to which I have come, it is unnecessary to determine the precise date of the beginning of the war, when this suspension commenced. It is immaterial whether we take the 15th of April, as stated in the replication—the date of the president's proclamation calling for volunteers—or the 19th of April, when, by proclamation he declared that an insurrection had broken out in certain States, including Mississippi, and declared his purpose to blockade the ports."

"As the contract and all remedies under it were absolutely suspended by the war, no suit could have been brought while that suspension continued."

"I have already shown that by the rules of public law, universally recognized among civilized nations, as well as by the decisions of our own courts, the existence of this war suspended all contracts between the citizens of the respective belligerents, entered into before it commenced. It rendered for the time being, all commercial intercourse between the citizens of the two sections unlawful and converted them into enemies."

And referring to the proclamation of President Lincoln in August, 1861, the learned judge adds:

"By force of this proclamation then, and the statute authorizing it, as well as by the legal effects of the war then existing, all pre-existing contracts between the people of the respective belligerents, including the right to enforce them by judicial proceedings, was thenceforth suspended."

I am not aware of any peculiarity of mortgages or deeds of trust which distinguishes them from other contracts for the security of money, so as to exempt them from the operation of the laws of war. Nor can I understand how a trustee or a mortgagee can claim to have more power in passing a title and dispensing with notices, than a court of competent jurisdiction over the subject.

I am therefore in favor of affirming the judgment of the Circuit Court of St. Louis, both at Special and General Term. And in this opinion Judge Adams concurs.